, STATE *v.* FREDERICK EASTWOOD.

May Term, 1901.

Present: TAFT, C. J., MUNSON, START, WATSON and STAFFORD, JJ

Opinion filed July 20, 1901.

*Criminal law—Homicide—Evidence—Connected facts—Evidence to show intention, motive, purpose, preparation and premeditation—* On a trial for murder the evidence of the state tended to show that the respondent set out with the declared purpose of breaking up the family into which he had married, and that in the course of a few hours, and with as much expedition as physical conditions would permit, he shot his wife, and his mother-in-law, his sister-in-law and her husband, and that one of the shots proved fatal. The whole proceeding constituted one transaction and was admissible in evidence, to connect the respondent with the fatal shot, and to show intention, motive, purpose, preparation and premeditation.

*Constitutional law—Declaration of rights, Art. 10—Acts 1898, No. 48—* Pending trial, a respondent, whose defense was insanity, was committed to tne Insane Asylum under Acts of 1898, No. 48, and on trial the superintendent of such asylum was permitted to testify to his opinion that the respondent was sane, basing such opinion upon his observations of the respondent while at the asylum. In this there was no deprivation of constitutional right. The respondent was not, in effect, compelled to give evidence against himself.

INDICTMENT for murder. Trial by jury, Addison County, June Term, 1900, *Tyler,* J., presiding. Verdict, guilty of murder in the first degree. The respondent excepted. The case is stated in the opinion.

*William H. Bliss* (assigned) for the state.

*James B. Donoway* for the respondent.

TAFT, C. J.   The respondent in August, 1899, lived in Greenfield, Massachusetts.   His wife, who had left him the previous April, resided with her mother, Mrs. Marietta Brown, at East Middlebury.   Mrs. Brown's daughter, Inez, was the

wife of Franklin Fenn who resided at Middlebury.   On the 14th day of August, 1899, the respondent came on the train from Massachusetts to the Salisbury railroad station, six miles from Middlebury.   He left the train and walked to Middlebury and at that place procured a team and drove to the house of Mrs. Brown his mother-in-law.   Upon meeting his wife and her mother, when inquired of by Mrs. Brown "where did you come from?" said, "I have come to break up the family."   He then fired at both his wife, who fell, and Mrs. Brown, seriously wounding them.   He then drove rapidly to Middlebury, a distance of five miles, and inquired for the residence of Mr. Fenn and on being told where it was went to it and sent word to Mrs. Fenn that her mother, Mrs. Brown, wished to see her at the house of her, Mrs. Fenn's brother, Edgar Brown; that her mother had come from East Middlebury and wanted to see her.   The house was about eight rods distant.   Mr. and Mrs. Fenn then went out from their own house, when the respondent accosted them saying, "is that you Frank?"   He then fired at them twice and Mr. Fenn with his wife turned and ran to the door of their own house and went inside, the respondent following, and when on the threshold, Fenn and his wife being in the narrow entry inside, he fatally shot Fenn and also fired one shot which passed through the door of an adjoining apartment; one shot hit Mrs. Fenn; whether she was hit when outside the house or when in the entry does not appear.   Afterwards he shot himself, but the bullet glancing from a rib, did no serious harm.

The testimony relating to the assaults at East Middlebury was admitted under objection and exception and it is claimed that it was not admissible, for "that the charge upon which the respondent is being tried cannot be supported by proof of his having committed other offenses."   Mr. Justice Stephen in his Dig. of Ev. 2nd Am. Ed. (1898) 357 note vi. states the mean-

ing of the rule when he says: "You are not to draw inferences from one transaction to another that is not specifically connected with it merely because the two resemble each other—they must be linked together by the chain of cause and effect in some assignable way before you can draw your inference." This rule is cited with approval in *Aiken* v. *Kennison,* 58 Vt. 665. In *State* v. *Totten,* 72 Vt. 73, the respondent was tried for stealing a pocket-book and contents from one Guyette. The respondent claimed and testified that one Finneran stole it, and in support of this claim offered testimony to show that on the night of the robbery, and after it, while he and Finneran were together at the house of one Ploof, that Finneran attempted to steal from his, the respondent's pocket. The testimony was excluded and this court held properly and said: "there was no evidentiary connection between the subsequent act and the one the respondent sought to establish. The subsequent act could have no effect in fastening the robbery upon Finneran except as showing that he was morally capable of it. Proof of this nature is inadmissible." The general rule contended for by the respondent's counsel, that one cannot be convicted of a crime by showing that he has been convicted of other and distinct crimes, is true, and is adhered to in all cases, but the exceptions are many and well enumerated in *State* v. *Kelley,* 65 Vt. 531, in which it is said: "but evidence which legitimately tends to support the charge is not to be excluded on the ground that it will show other offenses." One exception is so frequent that it has almost become a general rule of itself, i. e., testimony is admitted to show purpose, preparation and intent, and to connect the respondent with the commission of the offense, although it involves proof of a distinct crime. These exceptions are well stated in *State* v. *Kelley, supra,* and we have no doubt of their application in the case before us. The testimony to show the affray at East Middlebury was admitted

as connected with the main charge, i. e., the killing of Franklin Fenn.    It was all a part of what the respondent was then engaged in, as evidenced by the threat "I have come to break up the family."    What the respondent did at East Middlebury showed the purpose, and intention of, and preparation for, the act of shooting Fenn and connected him with the act at the time he shot him.    All that took place at Middlebury and East Middlebury was really one transaction.    He informed Mrs. Brown that he had come to break up the family and commenced shooting at her and her daughter with to him apparently fatal results, then drove rapidly about five miles to Middlebury and fatally shot the deceased and also shot Mrs. Fenn but not fatally.

It is evident that the respondent's intention in going to Middlebury was what he stated to Mrs. Brown, to break up the family.    The testimony tended to show that Mrs. Brown objected to her daughter's marrying him, that he thought the family did not treat him as they should, that they were unfair to him, that he and his wife had separated, but a few months before, and against his wishes, that he was not as cordial with the Fenns after the separation as before, that he thought the whole family never liked him very well, and were not as friendly to him as they ought to have been.    The testimony. also tended to show that the respondent had the intention to kill himself as a finale to the tragic affair, which is evidenced by the gift of his trunk to his step-mother with whom he stayed when at Middlebury, the line to her found in his satchel reading "Mother, this is the check to my trunk at the depot.    It is yours.    Fred."    It is apparent that he intended to kill them all and such naturally would be the probable effect of the shooting. The ball which wounded Mrs. Brown "just escaped her heart," he shot his wife "and she fell" the ball passing through her lungs and the wound was dangerous.    When he shot Mrs. Fenn the

ball struck her on the head back of the ear but glanced off, and when he attempted to shoot himself the ball struck a rib with a like result.    A mere accident prevented the deadly effect of the shot in each instance save in the case of Franklin Fenn.

The respondent's going to East Middlebury, his acts there, his return to Middlebury and the shooting of Fenn and his wife were all parts of a single, continuous transaction which was the breaking up of the family of Mrs. Brown, and that some of the facts indicate distinct and separate crimes did not render the testimony objected to inadmissible.    This holding is well supported by the case of *State v. Kelley* referred to by the respondent's counsel; we have already noted the cases of *Aiken* v. *Kennison,* and *State* v. *Totten.*    These are the only authorities cited in support of the claim in respect to the admission of the testimony.    The first case fully supports the admission of the testimony objected to, and there is nothing in the last two cases antagonistic to it.    In the *Kelley* case the respondent and an accomplice started with a horse and wagon upon an expedition of several hours duration with the intent to steal almost any article which came within their vision, and did so until their wagon was well filled with baskets, butter tubs, a robe, whip, bridles, blanket, bag of meal, a monkey wrench, a dead duck, and two lap-robes; the respondent was tried for the larceny of the two lap-robes and he objected to the testimony showing the other fourteen larcenies committed on the same expedition.    The testimony was admitted and this court held properly upon the ground that testimony to show other like offenses is received when it is necessary to prove a knowledge of the character of the thing in respect to which the act is done—e. g. the passing of counterfeit money, or, the receipt of stolen goods.    The respondent's intent was to break up the family of Mrs. Brown by shooting the differ-

ent members of it and his shooting at East Middlebury charac-
terized his act in shooting the deceased.   It indicated knowl-
edge on his part of the character of the act that he was then
doing—i. e. the killing of Mrs. Brown's family of which Mr.
Fenn was one.   To illustrate this question suppose in the draft
riots in N. Y. in 1863 the mob organized with the intent and
threat to hang every colored man in the city—after hanging ten
the leaders were indicted and were being tried for killing the
last victim, can it reasonably be contended that the intent, the
threats, and the hanging of the first nine of the victims could
not have been given in evidence to show the character of the act
in relation to the tenth? the motive, intent and knowledge in
respect to it?   We hold the testimony was admissible.

The testimony apparently shows great premeditation on
the part of the respondent in regard to the crime.   He left the
train at Salisbury instead of Middlebury, he made inquiries at
Salisbury about East Middlebury and was told that he was
about as near East Middlebury as he would be at Middlebury,
and a team was offered to carry him, but he said he would walk
to Middlebury to punish himself for being such a fool as to
leave the train at Salisbury.   He evidently did not intend to
begin his acts of shooting until after dark.   He went from
Salisbury to Middlebury, an ordinary walk of two hours, and
must have been in Middlebury at about five o'clock but he re-
mained at some place until seven o'clock when he went to his
step-mother's where he had supper and left Middlebury after
dark and as the testimony of both his step-mother and the
livery stable keeper shows he went therefrom after eight
o'clock.   It was somewhat later in the evening when he arrived
at East Middlebury and after the shooting at Mrs. Brown's he
returned driving rapidly to Middlebury at which place he com-
mitted the act of which he has been convicted.

The only other question argued by the respondent's counsel is the objection made to the testimony of the superintendent of the insane asylum at Waterbury.  The court below were notified that upon trial the respondent would claim he was insane at the time of the homicide, and at the December Term in 1899 the respondent was ordered committed to the asylum at Waterbury, under No. 48, Acts of 1898, and placed in the care and under the observation of the superintendent of the asylum. Under objection and exception the superintendent testified, giving his opinion as to the respondent's sanity, based upon what he saw of him and his actions and conversations during the time he was confined in the hospital.  He testified that in his opinion the respondent was sane.  The objection made to this testimony was that it was in violation of the constitutional rights of the respondent as guaranteed by Art. 10 of the "Declaration of Rights" in the Constitution, which provides that no person upon trial for a criminal offense shall be compelled to give testimony against himself.  The commitment of the respondent to the asylum was not in derogation of that right.  It was necessary to restrain him somewhere and it was as lawful to confine him in the asylum at Waterbury as in the jail at Middlebury and very likely it was more comfortable for him.  He could be observed by anyone at either place and such persons could testify without conflicting with the respondent's constitutional rights.  Otherwise one under indictment could insist upon strict seclusion and being unseen.  He was not obliged to do anything or say anything at the asylum, but if he did, any observer, including the superintendent, might testify and give his opinion as to his sanity based upon what he saw the respondent do and heard him say while he was in confinement in the asylum.  The testimony was admissible. There was no error in the admission of the testimony.

The other exceptions shown by the record are not insisted upon but upon examination we find no error therein.

*Upon inspection of the record the court are of opinion that judgment ought to be rendered upon the verdict and it is so ordered, and it is ordered that sentence and execution thereof be done.*