MARION HALL, *Plaintiff in Error*, v. THE STATE OF FLOR-
IDA, *Defendant in Error*.

## Opinion Filed November 13, 1919.

1. If in the examination of jurors upon their *voir dire* in a crim-
   inal case it appears that a certain juror is unqualified, but
   the court refuses to sustain the defendant's challenge for
   cause, who afterwards' excuses the juror by a peremptory
   challenge, the court's ruling will not be regarded as harm-
   ful error.

2. The question of the qualification of a venireman is a judicial
   one and is addressed to the court's discretion; any alleged
   error in the court's ruling upon a juror's qualification there-
   fore should be made affirmatively to appear, and that it was
   harmful to the defendant, to constitute reversible error.

3. The admission in evidence of a photograph of a house at
   which a homicide was committed and a photograph of the
   interior of the room in which it was committed, which photo-
   graph showed white spots indicating the places upon the
   floor where the persons fell who were shot, is not erroneous
   where such photographs do not themselves constitute a pic-
   ture version or interpretation of the character of the actual
   occurrence.

4. It is not error for the court in the trial of a criminal cause
   to admit in evidence the defendant's voluntary and non-
   committal account or statement to the sheriff of the trans-
   action upon which the charge against the defendant rests.

5. Where in a prosecution for murder the sanity of the de-
   fendant at the time of the alleged crime is a material issue,
   it is proper to receive in evidence the opinions of non-expert
   witnesses as to the defendant's mental condition when such
   opinions are based upon facts, circumstances, transactions in
   the defendant's life observed and noted by the witnesses who
   should detail such facts, circumstances and transactions in
   their testimony.

6. Where non-expert witnesses are offered in behalf of defendant as to his mental condition and such witnesses can recall no facts in the defendant's life tending to show insanity, but are permitted to express their opinions concerning his insanity, the court's action in allowing such evidence to be introduced at defendant's request, will not constitute reversible error where he instructs the jury that it is admitted "for what it is worth."

7. A charge requested by defendant which conveys the idea that if the jury considering any *portion* of the evidence necessary to a conviction, entertain a reasonable doubt as to its verity, they shoould acquit him, is erroneous.

8. The reasonable doubt which the law provides shall acquit a defendant is one that arises in the minds of the jury after considering, comparing and weighing *all* the evidence in the case.

9. Where the court charges the jury correctly upon reasonable doubt and presumption of innocence, it is not error to refuse an instruction in behalf of the defendant that he is presumed to be innocent and that presumption goes to the jury as independent evidence.

10. It is not error for the trial court to refuse requested instructions which are substantially covered by charges which the court has given.

11. A requested instruction which conveys the idea that the rule of reasonable doubt applies to each individual juror and segregates the jury as a body into individual parts and requires each one to be free from reasonable doubt before the jury can return a verdict is erroneous.

12. In a prosecution of a person for murder where the sanity of the accused at the time of the commission of the alleged offense is a material issue, the doctrine of irresistible impulse or moral insanity is not recognized in this State as a defense.

13. Drunkenness as an excuse for the commission of an unlawful act is no defense, it mitigates no degree of unlawful homicide, except murder in the first degree where drunkenness may be so complete as to eliminate the possibility of entertaining a premeditated design to kill, unless as a result of drunkenness there is a fixed or settled frenzy or insanity either permanent or intermittent.

14. A requested instruction which is designed to direct the jury's attention to any particular witness or set of witnesses, segregate them from the entire body of witnesses, or to separate any fact from all the material facts sought to be etsablished and give such witness or wintesses or fact undue prominence or importance either for the purpose of disparaging the witnesses or strengthening the testimony, is erroneous.

15. A requested instruction which directed the jury when a State witness exhibited bias or illwill towards the defendant or gave evidence that the jury did not believe, they should nevertheless weigh the evidence of such witness in the light of such bias or illwill, was correctly refused.

16. An instruction which directed the jury to acquit the defendant if the jury did not believe that the defendant had understanding or intelligence to commit murder by reason of being intoxicated, was properly refused.

17. Intoxication as an excuse for the commission of murder in the first degree does not apply to murder in the. other degrees.

18. Evidence examined and found sufficient to support the verdict.

Judgment affirmed.

*Sollie & Sollie* and *Daniel Campbell & Son,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart Gillis,* Assistant, for the State.

ELLIS, J.—The plaintiff in error was convicted of the murder of Arnold Mitchell in the Circuit Court for Walton County during January of 1919 and sentenced to suffer the penalty of death. He seeks here a reversal of the judgment on writ of error.

There are over one hundred and thirty-three assignments of error numbered from one to one hundred and thirty-one, two numbers, 87 and 106, being repeated. Many of the assignments of error are duplications. Assignments from seven to fifty-eight are repeated in assignments numbered from sixty-two to one hundred and eleven, which attack the court's refusal to give certain requested instructions to the jury. Assignments numbered from 118 to 131 attack the charge given by the court. Other assignments of error attack the sufficiency of the evidence to support the verdict and the court's rulings in the admission and rejection of evidence.

The facts in the case are few. The circumstances of the homicide which were exceptionally harsh to the point of brutality are practically undisputed in any detail. The defense was that the defendant was under the influence of alcohol or some intoxicating liquor to that degree where it could legally be said that he was insane and therefore irresponsible for his act, or was incapable of entertaining a premeditated design to take the life of the deceased or any person and therefore could not be guilty of murder in the first degree.

On the night of December 25th, 1918, Charlie Carter, father-in-law to the deceased, who was living with him at the time, gave a party at his home at which many people

in the neighborhood attended. Dancing was continued late into the night. It was observed that whiskey, in bottles, large and small, was plentiful and that the defendant drank some of it, although the matter of his soberness or intoxication was disputed. Sometime during the late evening the defendant, who had been dancing with a certain lady guest, left the room during the dance and his place was taken by Alvin Miller for the remainder of that dance, or set as it was called. Soon another set was begun and the defendant returned to the room and claimed the lady with whom he had been dancing, for a partner. It was explained to him that the set which was on when he left had been finished and the one now on was a new one. This explanation seemed not to please the defendant, who appeared to entertain the idea that his dignity, gallantry or bravery was impugned. He directed his resentment toward Arnold Mitchell, who had invited the lady to dance with him and whose invitation had been accepted. This lady, observing the displeased and resentful man, sought to pacify his feelings and restore his composure by offering to dance with him and turned from Arnold Mitchell with that purpose. This action seemed to have the contrary effect, for the defendant immediately drew his revolver and after shooting down Charlie Carter, the host of the evening, who seemed to be in the way of defendant's anger, he caught the deceased in the collar with one hand, fired his pistol into his body and, while the victim was on the floor, his head being supported by his wife, the defendant walked around the body and fired several more bullets into it, remarking as he left the room: "By God, I reckon you will dance now," or, "I guess, by God, you are dead now." Just before the de-

fendant fired the first time he said, "Arnold Mitchell, G—— d—— you, I am going to kill you."

There was much evidence as to the defendant's habits of drink, but as to his intoxication on the night of the homicide the evidence was conflicting. The evidence of the man's insanity was sought to be established by witnesses in the neighborhood and vicinity, who had known him for years and observed his conduct. These witnesses said in substance that the defendant had drunk whiskey since he was about fifteen years old, that of late years he had consumed more than usual; that when he was not drinking "he didn't act so curious;" that since he had been drinking so heavily of late "he acted like a different man;" that as the years went on the defendant's habit of drinking intoxicating liquors became "worse and worse" and he acted "less like a man in his mind." One witness, Sell Knowling, who was first cousin to the defendant, and who was with him a great deal, a kind of companion, or comrade, said that the defendant was a "pretty heavy drinker," that he had had the habit of drinking about "five or six years;" that some time before "Mitchell was killed he (defendant) had been worse than he had been before;" that the defendant's "conduct had changed from what it had been in other years after he got to drinking so heavily. It had changed a little bit, I mean by that, his ways and acting. He acted a little different from what he used to. There was a little difference in his ways and acting from what it used to be. He acted like he had less sense, less sense than he used to have." The witness said that in his opinion the defendant's "mind was bad." The defendant drank some whiskey that night, he danced, but "staggered like a drunken man." Other witnesses saw the defendant at the dance, but could not

tell from his conduct and manner whether he was drunk or not. The court permitted witnesses to state whether in their opinion the defendant was or was not of sound mind. Some of these witnesses, a brother, an uncle, a friend, his mother, testified that the defendant in their, was of unsound mind. A physician, answering a hypothetical question, said the killing of Mitchell was "evidence of insanity," "that the man (defendant) was probably insane." He afterwards qualified the statement, when all the facts were embraced in the question, to the extent of saying that the conduct of defendant showed "temper;" that he could not say conclusively that the defendant was insane. Other witnesses who saw the defendant at the dance, the night of the homicide, who have known him for years, observed his conduct and knew many of his ways and habits, said that he was not drunk the night of the dance; that if he was, they could not tell it, that he was quiet, did not stagger, and talked rationally. That the defendant himself had, since the homicide, said he was not drunk that night and knew what he was doing.

The jury decided with all the evidence before it that the defendant on the night of the homicide, when he killed the deceased, was not insane, that he committed the act from a premeditated design to take the life of Arnold Mitchell and was guilty of murder in the first degree. After a careful review of the eviednce and consideration of its probative force and bearing upon the unfortuante affair of that night in December, we are satisfied that the verdict was amply sustained by the evidence.

The first assignment of error attacks the ruling of the court in overruling the defendant's challenge for cause of the juror Hinzie. The record does not show that a

juror by such name was either examined or sat upon the jury. A juror named Heinsley upon his voir dire said that he was not related to either the defendant or deceased; if he was taken as a juror would render a fair and impartial verdict according to the testimony; had formed no opinion as to the guilt or innocence of the accused; that he had heard and read about the homicide, but what he had read and heard "would not weigh" with him in considering the evidence; although it had made an impression upon his mind which, however, would not "weigh with him" at all after hearing the evidence; that as a juror he would have to "exert his will power to overcome" that opinion or impression he had from reading and hearing about the case. The defendant's challenge for cause was overruled. It appears that this man did not serve as a juror in the case. The defendant challenged him peremptorily. It also appears from the record that the defendant did not exhaust all his peremptory challenges. Even if the venireman was unqualified to serve as a juror and the challenge for cause should have been sustained, it appears that he did not serve and the defendant's peremptory challenge had not been exhausted, so there was no harmful error, and the assignment should fail.

Mathis vs. State 45 Fla. 46, 34 South. Rep. 287; Denham vs. State 22 Fla. 664; Lambright vs. State 34 Fla. 564, 16 South. Rep. 582; Peaden vs. State 46 Fla. 124, 35 South. Rep. 204; Colson vs. State 51 Fla. 19, 40 South. Rep. 183; Melbourne vs. State 51 Fla. 69, 40 South. Rep. 189.

The question of the qualification of a venireman is a judicial one and is addressed to the court's discretion,

any error therefore should be made affirmatively to appear and that it was harmful to the defendant.

A photographer on January 15th, following the homicide, made two photogrraphs, one of the Carter house and the other of the room in the house where the homicide occurred. When the latter picture was taken some one placed on the floor of the room two pieces of paper, one to indicate where Mr. Carter fell when he was shot, and the other to indicate where the deceased fell. It is not clear what purpose was served in introducing this evidence, as there was no dispute as to the house or room in which the alleged crime occurred. No denial in the evidence that the defendant did the shooting, nor that Carter, the host, was shot and fell upon the floor and that Arnold Mitchell was killed. After these photographs were admitted in evidence and it was explained by the witness what the white spots in the photograph were caused by, the defendant's counsel objected to "so much of the pictures as contained said white spots and moved the court to strike the testimony about the papers being placed where the bodies lay and to exclude from the jury the white spots in the pictures as parts of the evidence." There was no ruling upon this motion, consequently no exception. The objection to the evidence was not made until the photographs had been admitted. The motion to strike the testimony about the papers being placed where the bodies lay was a little indefinite and might have been granted, but how the white spots in the pictures could be excluded without excluding the photographs is not clear. However, no error is made to appear, as the bill of exceptions does not show that any ruling was made on the motion. If the evidence was permitted to stand, it could have worked no injury to

the defendant in view of the nature of the case, the character of the defense. The photographs were introduced as mere representations of the place where the alleged crime was committed, not a representation of the act itself. And as there was no dispute between the parties as to the place where the homicide occurred and who committed it and upon whom it was committed, the photographs appear to have been unnecessary but harmless. The fact that placing the pieces of paper on the floor to represent the spots where the two wounded men were lying after the shots were fired made the photographs a kind of tableau picture, yet they were not subject to the criticism that anyone's version, theory or interpretation of the character of the act was thus sought to be brought before the jury as a photographic view of the actual occurrence. We think the assignment of error based upon the defendant's motion to strike the testimony and exclude the white spots from the pictures is without merit and must fail.

The sheriff of Walton County testified that on the morning of December 26th, the defendant came to him in company with another and told him, the sheriff: "That there was some shooting out at Mr. Carter's." The defendant's counsel moved the court to exclude that statement from the evidence. The motion was overruled, and that action of the court is assigned as the third error. There was no error in this ruling. Every word a defendant utters before or after arrest is not a confession of guilt. Sometimes the statements are self exculpatory and many times noncommittal. The statement that there had been some shooting at Mr. Carter's certainly inculpated no one and appeared to be entirely voluntary, as the defendant seemed

to have come to the sheriff of his own volition, merely to tell him of the fact.

The assignment of error is not sustained. The character of the defendant's statement to the sheriff does not support the theory upon which the argument is made in support of the assignment.

During the progress of the trial the defendant's counsel introduced several witnesses, some of whom were relatives, others acquaintances and friends of the defendant, and sought by such witnesses to ascertain whether the defendant was sane or insane at the time he killed the deceased. This information was to be based on the opinions of the several witnesses, who, knowing the defendant as a boy and later as a man, had observed his conduct, watched his career, observed his manners and noticed his bearing and conversation, were supposed to speak with a reasonable degree of scientific accuracy as to his mental condition at the time he killed the deceased. At first the offer to supply this kind of evidence upon the question of the defendant's sanity was declined by the court, but later the court revised its ruling and permitted defendant's counsel to recall his witnesses and obtain their vilws as to the soundness of defendant's mind. The defendant's counsel then recalled James Hall, a brother of defendant; Henry Knowling, an uncle; William Crowder and Mrs. Colvin, defendant's mother. These witnesses all testified that in their opinion the defendant was of "unsound mind," or "not in his right mind," or "not right at times." The Court stated that the witnesses should detail all the facts they knew concerning the defendant and what they had observed with reference to his conduct. The first witness examined after the announcement of this rule stated that he could not point out any acts now, but the

witness was permitted nevertheless to give his opinion that his brother was of unsound mind. After that, no further attention was paid to the rule announced by the court. Witnesses were permitted to testify that in their judgment the defendant was not in his "right mind" or of "unsound mind," because he did not "seem to be just like he ought to be;" that he made a trade once that was not profitable to him; that he talked "foolish at times when he was sober as well as when he was drunk;" "he looked different out of his eyes" and such matters. These statements were permitted to go to the jury, at the defendant's request, as the basis of the witnesses' judgments and opinions concerning his insanity. Counsel for the defendant say that the "inquiry of defendant's sanity or not shows up in shreds and bits scattered through pages and pages of the record, each shred or bit being so connected with the context to which it belongs and to the matter immediately preceding and following it, that it is wholly impracticable for (them) to separate these shreds and bits in (their) brief and present them in ordered form." We appreciate the difficulty under which counsel labored in the effort to show error in the court's ruling prejudicial to the defendant in this evidence, for it was admitted seemingly under no rule, but merely upon defendant's request. We are unable to discover in the judge's rulings that he "reluctantly admitted in evidence" that which he had previously through error excluded. The interpretation which counsel place upon the court's words when he announced that the testimony of these witnesses concerning the defendants' sanity should be admitted for what it was worth, is not justified by any conduct or word of the court during the progress of the trial. By that expression there was no encroachment by the judge upon the

province of the jury, nor do we perceive in it any effort
to influence their minds against the reliability of such tes-
timony. Counsel complain that the court first ruled that
the testimony of the non-expert witnesses should not be
admitted and then changed his ruling by allowing such
testimony to go to the jury "for what it was worth." The
record shows that the first witness placed upon the stand
in defendant's behalf was a first cousin, a young man
about twenty years old, who testified that defendant
drank heavily in recent months, the witness drank with
him. In answer to a leading question propounded by de-
fendant's counsel, he said that recently there had been
something apparently wrong with defendant's mind. The
court stated that the "witness (should) tell the acts that
(defendant) had done, but he can't testify that (defend-
ant's) mind was wrong. He is not an expert." The wit-
ness then said: "I have been in the presence of this man
when he was drunk with recent years a right smart, I
don't know how much he remains drunk as an ordinary
thing. A pretty good percentage of all his time. I saw
him while he was drunk and while he was sober. I know
his conduct and how he appeared when he was drunk.
I think from his conduct and manner that he has become
heavily addicted to drink." He was then asked by defend-
ant's counsel the following question: "Was he of sound
or unsound mind, sane or insane, for several months be-
fore the killing;" The state attorney objected to this
question and the objection was sustained. The witness
was then asked: "was that man since his habit of heavy
drinking,—has he been sane or has he been as you have
testified—was he, in your judgment, sane or insane;" The
court sustained an objection to this question and defend-
ant's counsel excepted. Later during the trial, the court

announced of its own motion that the defendant might recall the witnesses which the court had refused to allow counsel to examine concerning the sanity or insanity of the defendant. Then followed the testimony referred to above. The court, however, first announced the rule under which the opinion of the witnesses should be received. That rule was in conformity with the rule announced in Armstrong v. State, 30 Fla. 170, 11 South. Rep. 618, referred to in the brief of counsel for plaintiff in error. Whatever may have been the reason for not insisting upon the rule, the fact is, it appeared not to have been observed and the opinions of the defendant's relations and friends concerning his sanity, were permitted to go to the jury as the court said for what they were worth. Such opinions were not based upon any facts within the knowledge of the witnesses, but opinions based on vague, indefinite, obscure notions about defendant's abnormality. Such evidence was permitted, however, to be given. It was undoubtedly favorable to defendant. He could not have been injured by it unless on account of its complete transparency and inherent defects, it reacted upon the jurors' minds in a way not expected by counsel. But defendant is not in a position to complain, that evidence admitted at his request against the rule turns out to his disadvantage. On the subject of the rule announced by the court under which non-expert opinion is admissible concerning insanity, see: Leaptrot v. State, 51 Fla. 57, 40 South. Rep. 616; Davis v. State, 44 Fla. 32, 32 South. Rep. 822; Scott v. State, 64 Fla. 490, 60 South, Rep. 355.

Assignments of error numbered four, five and six, based upon the rulings above referred to, are not sustained.

Counsel for plaintiff in error discuss together assignments of error numbered 7, 8, 9, 11, 12, 13, 14 and 19. The

28—Vol. 78

same order is followed in the able brief of the Assistant Attorney General, who calls attention to the rule often referred to by this court, that where several assignments of error are grouped in the brief of plaintiff in error and one assignment fails, they all fail. See Atlantic Coast Line Railroad Co. v. Whitney, 65 Fla. 72, 61 South. Rep. 179. Two of the counsel for plaintiff in error, however, who are practitioners from an adjoining·State, express in their brief some apprehension of inadvertent departure from our rules. We are not disposed in this case to apply with very strict fidelity to practice the several rules adopted for the convenience of the court and bar, for several reasons. The case is one .of extreme gravity; counsel for plaintiff in error have labored diligently to present their client's case to this court in all its phases and some of the counsel at least labor under the disadvantage of imperfect acquaintance with our rules of practice.

The assignments of error referred to above are based upon the refusal of the court to give certain special instructions requested by the defendant and numbered, respectively, one, two, three, five, six, seven, eight and thirteen. The refusal of the court to give these instructions constitutes some of the grounds of the motion for a new trial and is again assigned as error under other and differently numbered assignments. Such duplications in the assignment of errors frequently occur and render the consideration of the case here very tedious, even difficulty, and the transcript and briefs unnecessarily large and expensive. The instructions above referred to, which were refused by the court, are upon the same subject, that is to say, they involve one principle only. They express the idea that where one is tried upon a criminal charge, and any portion of the evidence which is necessary

to a conviction is not believed by the jury beyond a reasonable doubt, the defendant is entitled to an acquittal.

This instruction in substance was disapproved in the case of Cook v. State, 46 Fla. 20, 35 South. Rep. 665; Bryant v. State, 34 Fla. 291, 16 South. Rep. 177; Ernest v. State, 20 Fla. 383; Lovett v. State, 30 Fla. 142, 11 South. Rep. 550. The trial court correctly and fully instructed the jury upon the law of a reasonable doubt, and explained that such doubt might arise upon a full and fair consideration of all the evidence. The requested instructions were not only properly refused because the court had instructed the jury upon the subject of a reasonable doubt and was not required to repeat the same principle of law in different form and couched in different phraseology, but the requested instructions were misleading, if not insiduous. Although this court had said that a reasonable doubt cannot arise from considering "a part or parcel" of the testimony, these instructions seem to advise the jury that it might consider any portion of the evidence upon any material question involved, and if the portion so considered was not believed to be true beyond a reasonable doubt the defendant should be acquitted. It often occurs that several witnesses are called to establish one or more essential elements of the crime charged, the testimony of each witness is a "portion" of the evidence, the jury may not believe a certain witness, they may doubt his veracity and yet believe what others have testified to on the same point, yet under the rule announced in the requested instructions the defendant should be acquitted, notwithstanding the jury upon consideration of all the evidence would entertain no reasonable doubt of guilt. As the court said in

the Bryant case, *supra*: "The reasonable doubt which the law requires shall acquit a defendant is one that arises in the minds of the jury after considering, comparing and weighing all the testimony in the case." If it is objected that the construction here placed upon the requested charges is too narrow, that the word "portion" must be taken to mean all the evidence which may bear directly or indirectly upon any material element of the crime charged, then the charges are in substance not different from the court's general charge upon the subject of a reasonable doubt.

The principle announced in the case of Gavin v. State, 42 Fla. 553, 29 South. Rep. 405, that proof beyond a reasonable doubt must be had as to all facts necessary to make out the case of the prosecution, in a criminal case, does not afford any argument in support of the requested charges, which deal not with any essential fact to be proved, but with any portion of the evidence as to such fact.

After considering all the evidence in the case, if the jury has a reasonable doubt as to the existence of any fact necessary to constitute guilt on defendant's part, there should be an acquittal. But this is not the meaning of either one of the eight charges requested. The able discussion of these charges by counsel for plaintiff in error fails to convince us that the court departed from any sound rule or denied the defendant any right in this particular. The fact that it required ten pages of counsel's brief, practically without citations of authority to take up space, in which to explain the phraseology of these requested charges, is in itself almost sufficient proof of the involved and entangling terms in which they are framed.

The charges deal with the phrase, "any portion of the evidence." This court in the Gavin case uses the phrase, "facts necessary to make out the case." The brief of counsel would make no distinction or difference in the meaning of the two phrases, because counsel say that the words, "material and necessary to a conviction," are coupled with the words, "any portion of the evidence," so that consideration of all the evidence is essential to determine which parts of it are essential to conviction. But when would two men upon any jury place precisely the same valuation upon the testimony of any witness either as to probative value or materiality, especially if the case should happen to be one of circumstantial evidence? To send the jury upon a quest for those portions of the evidence, material and essential to conviction, would involve them in more difficulties than should be saddled upon man, who as a juror is required to consider and compare all the evidence and arrive at a conclusion that satisfies his conscience under the rule of reasonable doubt, regardless of the processes of reason or lack of it by which others arrive at their conclusions. If all men reasoned alike, the necessity for twelve jurors in a murder case would not be apparent.

Requested instruction number four was refused, and complaint is made of that ruling under the tenth assignment of error. The charge declared that the law presumes the defendant to be innocent, that the presumption goes to the jury as independent evidence and there can be no conviction until the presumption is overcome by proof beyond a reasonable doubt of defendant's guilt, and unless it is so overcome he must be acquitted. The court instructed the jury that the defendant was presumed to be innocent until his guilt was proven be-

yond a reasonable doubt and that the burden of proof was upon the State to prove his guilt and every material fact necessary to constitute the offense beyond a reasonable doubt. There is no difference in substance, so far as language is concerned, between the two charges, further than in one case the jury are told that the presumption of innocence is one of law and comes to them as independent evidence. In effect, however, the instruction given by the court is the same. The jury knows that the court gives them the *law* in charge. Therefore, under the charge as given they knew that the presumption of innocence was one of law, that they were required by law to consider and that before a conviction could be had the presumption of innocence had to be overcome by proof of guilt beyond a reasonable doubt. Counsel seems to contend that there are two stages in the process of conviction, viz: first, where presumption of innocence is overcome; second, where proof of guilt beyond reasonable doubt is established. The argument is more specious than sound. The defendant is either guilty or not guilty. There is no middle ground or "twilight zone," known to the criminal law. The State must establish guilt beyond a reasonable doubt or fail in the prosecution, in which case the defendant is innocent in law. If there could be such a state of case where the jury would say that the evidence removes the presumption of innocence, but fails to show guilt, the defendant would still, in law, be presumed to be innocent and entitled to acquittal. This in substance is what the court charged the jury. We think there is no merit in this assignment of error. The next assignment of error discussed is No. 42. It rests upon the refusal of the court to give an instruction similar in all respects to the

one just discussed. It is a little fuller in that it contains more words, but no more meaning.

Assignments of error numbered 15, 29, 30, 45, 46, 49, 50, 54, 55 and 56 are discussed together. These assignments attack the rulings of the court in which it refused certain requested instructions in defendant's behalf. These assignments are repeated in those numbered 70, 84, 85, 99, 100, 103, 104, 107, 108, 109. These requested instructions were designed not only to emphasize the thought to the jury that the verdict should be unanimous, but to segregate the jury into twelve parts and confine the doctrine of reasonable doubt to each part, that there could be no verdict of guilty unless each juror believed the defendant to be guilty beyond a reasonable doubt, that if any one or more of the jurors had such doubt after considering all the evidence, the defendant could not be found guilty. At the request of defendant's counsel, the court gave the following charge: 'It is the duty of the jurors severally and separately and jointly to weigh and consider the evidence and determine whether or not in their joint and several minds they believe from the evidence that defendant is guilty and there can be no conviction until the entire jury believe from the entire evidence and beyond a reasonable doubt that he is guilty." Counsel in their brief say that they are "impressed" that this charge in substance covers those which were requested and refused upon this subject, but they do not concede it. We think it does. The law does not require the court to repeat its charges. When a proposition of law is embraced in a charge which clearly conveys the thought to the minds of the jury, it is not error for the court to refuse other instructions embracing in substance the same thought but in different phraseology. See Pinson v. State, 28 Fla.

735, 9 South. Rep. 706; Smith v. State, 57 Fla. 24, 48 South. Rep. 744; Green v. State, 43 Fla. 556, 30 South. Rep. 656; Higginbotham v. State, 42 Fla. 573, 29 South. Rep. 410; Graham v. State, 72 Fla. 510, 73 South. Rep. 594; Hawthorne v. State, 72 Fla. 524, 73 South. Rep. 590; Fine v. State, 70 Fla. 412, 70 South. Rep. 379.

The principle announced in the requested instructions, however, was disapproved in the case of Boyd v. State, 33 Fla. 316, 14 South. Rep. 836; Barker v. State, 40 Fla. 178, 24 South. Rep. 69; Ayers v. State, 62 Fla. 14, 57 South. Rep. 349.

To attempt to confine the doctrine of reasonable doubt to individual jurors, or that segregates the jury as a body into individual members and requiring each of such members to be free from reasonable doubt before they can return a verdict is error. Such is the language of the headnote in the case last cited. This very thing the refused instructions undertook to do, and though the court did give an instruction, the effect of which would be that which this court has disapproved, the instructions was given at defendants' request for his benefit and he cannot now complain.

Assignment of error numbered sixteen is based upon the court's refusal to give charge numbered ten requested by defendant. This asisgnment is also covered by number 71. The requested instruction is upon the subject of the "diseased mind" of the defendant which it was contended at the trial was caused by the habit of drinking alcoholic liquors. The instruction is not clear and is calculated to mislead. It advises the jury that although they may not be satisfied from the evidence that the defendant was of "diseased mind from the habit of drinking alcoholic liquors" when he killed Mitchell, if he

killed him, yet if from the evidence the jury believed defendant was drunk to such an extent as to "disable him to exercise those mental faculties which must be exercised to render one guilty of murder in either degree," the jury could only convict of manslaughter and could not convict of manslaughter unless they believed him guilty of that offense.

It is conceded that the instruction is "involved." It is not only involved in the sense that it is complicated and entagled in confusing and misleading words, but if it bears the interpretation contended for by counsel for plaintiff in error, the law was correctly and fully given by the court in other charges.

We have examined carefully all the charges given by the court as well as those requested by the defendant's counsel and refused, which cover the subject of drunkenness and insanity, and we are of the opinion that the court by charges appropriate to the evidence submitted to the jury for their determination, the question whether the accused at the time of the unlawful act with which he was charged, had a sufficient degree of reason to know that he was doing an act that was wrong. See Cochran v. State, 65 Fla. 91, 61 South. Rep. 187; Davis v. State, 44 Fla. 32, 32 South. Rep. 822; Copeland v. State, 41 Fla. 320, 26 South. Rep. 319.

In the Davis case, *supra*, this court adopted the rule laid down in McNaghten's case, 10 Clark and Finley, *199, text pp. 209-211, as to insanity as a defense to crime. If the accused at the time the act in question was committed had the use of his understanding so as to know that he was doing a wrong act, he was in a sound state of mind. The idea is also expressed in these words in the Davis case: "If the accused was conscious that the act

was one which he ought not to do and if that act was at the same time contrary to the law of the land, he is punishable." The court said the question should be left to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong. The "irresistible impulse" or "moral insanity" doctrine is not recognized in this State as an excuse for an unlawful act. See Cochran v. State, *supra*.

In the case last cited, this court, speaking through Mr. Justice WHITFIELD upon the subject of drunkenness as excusing the commission of an unlawful act or relieving from its consequences, said: "Intoxication does not excuse or mitigate any degree of unlawful homicide except murder in the *first* degree, unless as a result of such intoxication there be a fixed or settled *frenzy* or *insanity* either permanent or intermittent." "If excessive and long continued use of intoxicants produces a mental condition of insanity, permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequence of the act that would otherwise be criminal and punishable."

In the case of Garner v. State, 28 Fla. 113, 9 South. Rep. 835, it was said that *voluntary* intoxication is a matter for consideration with reference to the ability of the accused to form or entertain a particular or specific intent essential to an offense. That as between murder in any degree below the *first* and manslaughter, voluntary intoxication plays no part. "The only purpose," said the court, "for which it is admissible is to show an absence of a premeditated design to kill or that the killing was not murder in the first degree, and the only

effect of proof of intoxication rendering the accused of incapable of forming or entertaining such design will be to reduce the killing to *murder* of the second or third degree according to the circumstances."

We will briefly review the charges given by the court to the jury in this case, to the end that it may be shown that the law on the subject of intoxication as an excuse for the commission of an unlawful act was fully given in charge to the jury.

The court charged the jury fully upon the subject of a premeditated design as an element in the crime of murder in the first degree and that before there could be a conviction of the defendant the jury had to find beyond a reasonable doubt that the defendant killed the deceased from a premeditated design to take his life. That if the defendant unlawfully killed the deceased and at the time was under the influence of liquor voluntarily taken by him, his intoxication would be no excuse for committing the act, unless such intoxication deprived the defendant at the time of the killing, of the mental capacity to form a premeditated design or malicious purpose to kill in which case the defendant may be found guilty of murder in the second degree or *manslaughter*. The court said that voluntary intoxication not resulting in a fixed or settled frenzy or insanity either permanent or intermittent does not excuse or mitigate any degree of unlawful homicide below murder in the first degree.

"While the mental effects of a mere intoxication, may not excuse the commission of an unlawful act or relieve from its consequences, yet if excessive and long continued use of intoxicants produce a mental condition of insanity permanent or intermittent and that such insane condition exists when an unlawful act is committed, such in-

sane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable—Therefore gentlemen of the jury, should you find from the evidence beyond a reasonable doubt that the defendant shot and killed Arnold Mitchell, if he did kill him, was at the time in such a state of fixed or settled frenzy or mental insanity induced by antecedent and long continued use of intoxicating drinks or liquors, and not produced by the immediate effects of intoxicating drinks, as not to have been conscious of what he is doing, or that the act was wrong, you will find the defendant not guilty."

At the request of the defendant the court instructed the jury that if the defendant was drunk when he committed the homicide, so that he was unable to entertain the "purposes or designs or to exercise the mental faculteis necessary for the commission of the crime of murder in the first degree, then the jury could not convict him of murder in that degree." They were also instructed that voluntary drunkenness on the defendant's part at the time of the killing would excuse him from the charge of murder in the first degree if he was incapable of exercising his mental faculties which must be exercised to commit murder in that degree; also that before the jury could find the defendant guilty, they must believe beyond a reasonable doubt that he possessed a mind sufficiently free from disease to enable him at the time of the killing to exercise the mental function which must be exercised in the perpetration of murder in one of its degrees or manslaughter.

Charges were requested by defendant embracing the same view of the law upon the subject of intoxication as an excuse for the commission of a crime requiring a cer-

tain or specific intent, and enlarging the doctrine as announced by this court to the point where they were without merit in that they declared the doctrine of irresistible impulse which has been shown to have been condemned by this court. These charges were made the subjects of assignments of error numbered 16, 18, 23, 31, 33, 44, 47 and 59. Assignment of error numbered 17 is abandoned. These assignments are also covered by those numbered 71, 72, 73, 78, 86, 87-b, 98, 101. No error is made to appear by these assignments and they are not sustained. The learned counsel for the plaintiff in error, urge us to reverse the decisions of this court in which it was announced that the doctrine of "irresistible impulse" or "moral insanity" was not recognized in this State as an excuse for an unlawful act.

The question as to what degree of irresponsibility should constitute incapacity to commit a criminal act was fully discussed in the case of Davis vs. State, *supra*. It was there pointed out that in the absence of a statute defining such degree of irresponsibility the common law rule should govern. In 1903 the Davis case was followed on this question in Williams vs. State 45 Fla. 128, 34 South. Rep. 279, and again in 1913 in Cochran vs. State, *supra*. The question seems to have first engaged the attention of this court in 1899, where in Copeland vs. State 41 Fla. 320, 26 South. Rep. 319, the doctrine in the McNaghten case, *supra*, was first referred to as announcing the correct rule. For nearly twenty years the doctrine of "moral insanity" has been expressly repudiated in this State and in the meantime legislatures have assembled and adjourned without enacting that doctrine into law. If it is true that there can be such a condition of mental irresponsibility on the part of any person that

he or she, may be fully conscious of the nature and character of the act intended to be committed and know that it is a wrong act, and deliberately from a premeditated design to kill, commit the act, and yet be said to be irresponsible because impelled by a so-called "irresistible impulse" to commit the act, that coondition has never commended itself to the common sense of the legislature, and as such doctrine was not the rule at common law it is not the rule in this State. We deem it unnecessary to discuss the merits of the doctrine, if it possesses any. We prefer to leave the matter to legislative action, both as to the degree of mental irresponsibility that should operate as an excuse for committing an unlawful act and the method of proof of the existence of such mental condition. Human life is not held at the mercy of the unreasonable fears or cowardice of persons, neither should it be held at the caprice of those individuals who move among their fellows unrestrained, attend public places and social functions, but who claim immunity from punishment for violation of law upon the ground that they are so constituted that when they want to do a thing they just can't help doing it. It is possible that science may discover such a mental condition and the means of proving it. When it does and the legislature enacts that such mental condition should excuse one from committing crime, such as murder, rape, arson, burglary, larceny, etc., then the courts will avail themselves of "every advance in science" to discover the truth in the case presented.

Assignments of error numbered 20, 24, 25 and 38 attack the ruling of the court in refusing instructions numbered 14, 18, 19 and 32. The above assignments are also duplicated by those numbered 75, 79, 80 and 92. Some of these charges express the idea that the jury are the

judges of the weight of evidence and credibility of the witnesses. In so far the charges were correct and were fully covered by the general charge. Some of them, notably the 14th and 18th, directed special attention to the State's witnesses in connection with the duty of the jury to reject such evidence as they deemed unworthy of belief. In this particular the requested instructions were wrong. It is improper to segregate any witness from the entire body of witnesses or any fact from all the material facts sought to be established and by calling special attention to him or it, give him undue prominence or the fact undue importance either for the purpose of strengthening the testimony of the witness or disparaging it. Nor should this be done with reference to any class of witnesses. A witness is no more a liar because he is called by the State than when he is called by the defense, and there is no greater reason for cautioning the jury to disregard the evidence of State witnesses when they speak falsely than to disregard that of the defendant's witnesses for the same reason. Charge numbered 19 in phraseology slightly different from that used by the court dealt with the question of a reasonable doubt and the jury's duty in the matter of weighing the evidence. In the discharge of this duty they were instructed to use common sense. Although the court did not tell the jury in those words that in the performance of their function they should use that very desirable degree of sense, we think that the failure to do so on request was not reversible error. In the thirty-second charge requested, the jury were directed to give to the "defense in this case and the evidence which tends to support them, if any of it tends to support them, a *charitable* as distinguished from an unfriendly view and consideration and not captiously to

reject either." If it was intended by this charge to direct the jury's attention to the *witnesses* for the defense and ask for them, *charitable* consideration of their testimony, the charge was both unjust to the defendant and unfair to the witnesses, in so far as such direction might imply that without the exercise of that virtue by the jury the disingenuous character of their testimony might be apparent. We find no error in these assignments and the same are not sustained.

Assignments numbered 21, 26, 27, 32, 43, 48, 51, 52, 53 and 60 are next considered. These raise the question of the correctness of the court's refusal to give requested instructions numbered 15, 20, 21, 26, 37, 42, 45, 46, 47 and No. c. The same questions are also presented by assignments numbered 76, 81, 82, 87, 97, 102, 105, 106, 106-b. These requested instructions dealt with the subject of reasonable doubt which was fully covered by the court in its general charge and they sought to apply an abridged interpretation of the rule in cases of circumstantial evidence, which was not applicable to the facts in this case. Some of them seemed to place the burden upon defendant of establishing his innocence, by putting the affirmative side of the rule of reasonable doubt, as for instance "No. 47. If every aspect of the evidence when duly weighed and considered *supports* a reasonable supposition that defendant is *innocent* he must be acquitted," which we think would have constituted error to have given. The court charged the jury fully on the subject of a reasonable doubt. The defendant got the full benefit of his right to have the jury informed upon this subject, he also had full benefit of the law of presumption of innocence, the charges requested could have produced no other effect than to confuse perplex, obscure the true principle

of law so clearly expressed by the court in its general charge couched in language often approved by this court. See: Brown vs. State 46 Fla. 159, 35 South. Rep. 82; Baker vs. State 51 Fla. 1, 40 South. Rep. 673; Lovett vs. State 30 Fla. 142, 11 South. Rep. 550; McCoggle vs. State 41 Fla. 525, 26 South. Rep. 734; Cook vs. State 46 Fla. 20, 35 South. Rep. 665; Bass vs. State 58 Fla. 1, 50 South. Rep. 531.

The refusal to give the sixteenth instruction requested is made the basis of the 22nd and 77th assignments of error. The instruction directed the jury that when a state witness exhibited bias or ill will toward the defendant, or gave evidence which the jury *did not* believe, it was nevertheless their duty to "weigh the evidence of such witness in the light of such bias or ill will and accord it such weight or credibility as they think it entitled to," etc. In many typewritten pages of high sounding phrases and "learned talk" counsel undertakes to demonstrate the correctness of the above charge from a standpoint of logic and the "cannons and recognized forms of thought and reasoning." We think the charge is bad, because if the jury does not believe the testimony of a witness because of his ill will or bias or for other reason then the jury is not required for any reason to give such testimony any credibility or weigh it at all. The court fully and correctly charged the jury as to its duty and privileges in the matter of weighing evidence and estimating the credibility of witnesses. There was no error in refusing this charge.

The 28th and 88th assignments of error are based upon the court's refusal to give instruction numbered 22 as requested by the defendant. This instruction directed the jury to acquit the defendant of murder, if they were reasonably satisfied that he did not have "understanding or

intelligence to commit murder," by reason of being intoxicated. There are many reasons why this instruction was bad. In the first place, murder is divided into three degrees and the charge takes no account of voluntary intoxication. In the second place, if the principle announced was correct it would not be required of defendant to satisfy the jury that he was in such mental condition, it would be sufficient for acquittal if the evidence raised in the jury's minds a reasonable doubt as to the defendant's ability to entertain the necessary intent or design. There was no error in refusing this instruction.

The 34th, 35th and 89th assignments of error are based upon charges numbered 28 and 29, requested by the defendant and refused. In the case of charge numbered 28, counsel admits that it is "universally condemned by the decisions of the Florida Courts," but that the State of Alabama holds differently. As to the 29th requested instruction, counsel admit that it was substantially covered by the general charge. So there was no error in refusing these two instructions. The twenty-eighth charge sought to apply the doctrine of intoxication as an excuse for committing murder in the first degree to murder in all its degrees and the 29th charge was upon the subject of a reasonable doubt.

Requested instruction numbered 33 is made the basis of the 39th and 93rd assignments of error. This charge informed the jury that they could not find the defendant guilty of murder or manslaughter unless they believed from the evidence beyond a reasonable doubt that he was guilty. The general charge covered the proposition.

Assignments of error numbered 36 and 90 attack the

court's refusal to give charge numbered 30. In the brief, however, counsel discuss requested instruction numbered 34, the refusal to give which is made the basis of assignments numbered 40 and 100. There was no error in the refusal to give either charge. Number 34 required acquittal if there was a probability of innocence and number thirty directed the jury to consider the good character of defendant for peace and quiet with all the other evidence and if there was a reasonable doubt of his guilt to acquit him. The defendant's reputation for peace and quiet was not attacked nor put in issue. He was not even a witness in his own behalf, but the court's charge was full upon the law of presumption of innocence, reasonable doubt, and self-defense, although the latter charge was not applicable to the evidence.

The 41st assignment of error and the 95th attack the court's ruling in refusing the 35th requested instruction. This was an instruction upon the subject of manslaughter which was fully covered in the general charge.

The 57th and 110th assignments of error attack the refusal to give requested instruction numbered 64. This charge directed the jury to acquit the defendant if they believed that his mind at the time of the killing of Mitchell was in a state of settled frenzy or insanity, either permanent or intermittent as distinguished from voluntary intoxication and to such an extent as to dethrone reason and subdue his will and disable him from exercising the mental functions necessary to constitute murder in either degree or manslaughter. The court refused the charge upon the ground that it was covered in the general charge. Under assignment of error numbered 16, as discussed in this opinion, the charge there quoted which was given by the court, we think fully states the law upon

·the subject. But other instructions given at defendant's request covered the same proposition of law, and those charges given by the court were even more favorable to the defendant than the one requested.

Under the 58th and 111th assignments of error counsel for defendant insist that the court should have instructed the jury to acquit him. It is argued that there was no proof of venue. This position is without merit. There was evidence that the crime was committed at the home of Charlie Carter, and that he lived in Walton County. A picture of the house was made and identified by witnesses as the home of Carter and the place where the crime was committed.

The 112th, 113th, 114th, 115th, 116th, and 117th assignments of error raise the question of the sufficiency of the evidence to support the verdict. Although the bill of exceptions in this case does not conform to the rule, which requires a certificate that it contains all this evidence and in fact purports to set forth only in substance the testimony of the witnesses, and by reason of such defect in the bill of exceptions the assignments of error based upon the contention that the evidence was insufficient to support the verdict would have to fail. We have, nevertheless, in view of the consideration heretofore mentioned examined the evidence as shown by the bill of exceptions and we are of the opinion that it amply sustains the verdict.

The assignments of error numbered 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, and 131 challenge the correctness of the court's charge to the jury in many particulars. It would be of no benefit to set out in this opinion the court's charge in full, nor to answer the criticisms of counsel. Arguments have been made in

support of what to us appear impossible positions. For instance, complaint is made that the court erred in directing the jury that if they believed from the evidence beyond a reasonable doubt that the defendant was guilty of murder in the first degree, they should find him guilty. Other equally clear and perfectly correct and sound propositions of law are attacked and made the subject of assignments of error and many pages of the brief devoted to their support. We have carefully examined the instructions given by the court upon its own motion, and at the request of defendant's counsel, we have also examined the instruction requested and refused and we have found no reversible error in any particular in the trial of this case. The record shows that the defendant was represented by able and resourceful counsel, that the jury was composed of fair and impartial men, that the judge was liberal in his rulings, both in the admission and rejection of evidence and the instructions to the jury. The trial was without prejudicial error to the defendant in any of its phases and the court's rulings were in no instance subject to the criticism that the strict rule of the law was invoked against the defendant. We have discovered no error in the record, so the judgment is affirmed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.

BROWNE, C. J., concurring.—I concur in the decision in this case, but wish to call attention to a remark by the court which under a different condition of facts would in my opinion be harmful error.

In the examination of one of the witnesses who gave his opinion as to the mental condition of the prisoner, this

question was asked, "In your judgment, are you prepared to say that your brother was of unsound mind?" In ruling upon an objection to this question, the court said, "Well, the value of it is for the jury, to judge from the nature and the conduct, you can let it go to the jury for what it is worth." The use of expressions of this character by a trial judge in admitting testimony—"it can go to the jury for what it is worth."—is not to be commended. If the testimony is proper to be considered by the jury, it should not go to them discredited by a slighting remark from the trial judge as to what it is worth. All testimony goes to the jury "for what it is worth," and trial judges should not select portions and submit them to the jury with this or similar discredited remarks.

Mr. Justice ELLIS has fully discussed the testimony of the witnesses relating to the sanity of the defendant, and this court holds that the testimony was not properly admitted; but as it was permitted to go to the jury at the defendant's request, and was favorable to him, no harm was done the prisoner in this instance by the judge's remark.