THE STATE OF WYOMING,

                       *Plaintiff and Respondent,*

         vs.

CLAY RIGGLE,

                       *Defendant and Appellant.*

(No. 2666; June 5th, 1956; 298 Pac. (2d) 349)

2

4

6

8

10

For the defendant and appellant the cause was submitted upon the brief and also oral argument of William G. Watt and D. N. Sherard of Wheatland, Wyoming, and Thomas O. Tacy of Council Bluffs, Iowa.

For the Plaintiff and Respondent the cause was submitted upon the brief of George F. Guy, Attorney General; Robert H. McPhillamey, Deputy Attorney General; Howard B. Black, Walter J. Muir, Arthur F. Fisher, Assistant Attorneys General; M. R. Foe, County and Prosecuting Attorney, Platte County, Wyoming; and also oral argument by Mr. Guy, Mr. Muir and Mr. Foe.

## OPINION

Blume, Chief Justice.

The defendant Clay Riggle was charged with the crime of first degree murder. He pleaded not guilty, and later further pleaded not guilty by reason of sanity. A trial was had, and the jury convicted the defendant of first degree murder without adding the phrase "without capital punishment" as permitted by the provisions of § 9-201, Wyoming Compiled Statutes, 1945, and the defendant was thereupon sentenced to die in the gas chamber in the penitentiary at Rawlins, Wyoming.

Defendant Riggle was born on December 20, 1900, in Woodbine, Iowa. Two weeks before graduating from high school at Macedonia, Iowa, he left and came west to Wyoming. In 1920 he started following rodeos and did so for approximately twenty years. He specialized in trick roping and by reason of that acquired the nickname of "Tricky". Some twenty years before 1953, he was thrown from a steer, striking his head against a post of the fence surrounding the arena and was unconscious for a period of about twenty minutes. Some nineteen years previous to 1953, he was thrown from a Brahma bull, striking his head against a wooden fence and was unconscious for about thirty minutes. Thereafter when riding in a bucking bronco show he was

thrown to the ground and rendered unconscious and suffered total amnesia for a period of three days, regaining his memory in another town. During the threeday period of amnesia, he rode broncos with ordinary skill. These facts are according to the testimony of the defendant himself. Defendant came back to Wyoming about 1941, apparently doing ranch work for a time. He worked for Charles Perry in a lumber yard for about three or four years prior to1953. He did some plastering, flooring, general lumber work, stacking lumber, loading trucks and so forth. While working for Perry in October 1952, Riggle suffered a fall from a scaffold upon which he was standing, his head being about nine feet above the floor, and struck his head on the concrete floor and was unconscious for possible thirty seconds. He went on working that day but was unable to work the next day because of a headache. Thereafter in January 1953 he fell backward from a boxcar and during the same month he commenced having spells of partial consciousness during which he mumbled to himself incoherently, forgetful of the presence of others who were with him, forgetful of some of the work he was doing. Some time during the same month he sank to the ground on several occasions, his knees buckling under him, these spells lasting up to March 28, 1953. The injuries from the falls did not require a doctor during that time. After the mumbling period he showed no changes other than forgetfulness, irritability and awkwardness.

He became acquainted with Frances Williamson during the summer of 1952 and according to his testimony, he and Frances agreed to be married about March 28, 1953. The defendant testified that about March 1, 1953, while in the apartment of Frances Williamson, he had some arguments with Walter Akerblade, the deceased, at which time he told

Akerblade that he and Frances Williamson were engaged to be married and that he threw Akerblade out of the apartment.

The homicide with which the defendant is charged occurred on the evening of March 28, 1953, between 8:15 and 8:30 p. m. In this connection two different places in Wheatland, Wyoming, should be noted. The homicide with which the defendant is charged occurred in what is called the Angle Cafe which is on an alley in Wheatland, the doors of the cafe being on the south side thereof facing the alley. The other place to be noted is the Top Hat Bar which is in a block directly west of the block in which the Angle Cafe is located. The Top Hat Bar faces Ninth Street which is the main street of Wheatland and is approximately in the middle of the block. Immediately south and on the corner of the same block is the Pioneer Drug Company. The street south of the Pioneer Drug Company, running east and west, is Gilchrist Street and there is an alley west of the Top Hat Bar and the Pioneer Drug Company which runs north and south, and in which the defendant had parked his car.

The defendant quit his work at the lumber yard about 5:30 p. m. on March 28, 1953. His movements were traced to a more or less extent, commencing with about six o' clock that evening, by four different witnesses. They did not all testify to the same matters or incidents but all agreed that the defendant was angry at Frances Williamson and Akerblade from about six o'clock that evening up until the time the homicide here in question took place at about 8:15 p. m. to 8:30 p. m. of that date.

The witness Sparks, bartender at the Top Hat Bar, testified that about six o' clock that evening he saw Akerblade, Frances Williamson, Randall, and defendant

Riggle in the bar. Defendant was angry and excited. Frances Williamson was excited and Charles Randall was angry and excited. Frances Williamson complained to him that Riggle was bothering her and following her and her companions around to which she objected and asked him to throw the defendant Riggle out. The witness answered he had no right to do so. Riggle left the bar about 7:30 p. m. and returned about 7:45 p. m., at which time Akerblade and Frances Williamson were still there. Riggle asked the witness why he was going to throw him out and the witness answered he would not do so if he did not cause any trouble. Riggle mumbled to himself for about five minutes and then left. The witness testified that at one time during the evening defendant Riggle mentioned something regarding marriage to Mrs. Williamson; that defendant was at the bar drinking a little and giving her hell, cussing her out and said that he asked her to marry him.

The witness Greenlee testified that he went to the Top Hat Bar about seven o' clock the same evening and saw Akerblade, Frances Williamson, Burk and the defendant Riggle there. Riggle started to talk to the witness and witness saw that defendant was mad at somebody. Defendant stated he did not know what he was going to do about the woman, meaning Frances Williamson. Witness noticed that defendant had some difficulty with the bartender, evidently concerning throwing defendant out, and defendant stated that the bartender would not get a chance to throw him out as defendant would kill him before he could get over the bar. Defendant was not drunk.

The witness John Burk testified he was at the Top Hat Bar about 7:30 p. m. on March 28, 1953. Ferguson, Akerblade, Frances Williamson, Randall and Bolte were there. Frances Williamson and Akerblade were at the

bar. Riggle came in and laid his hand on Akerblade's shoulder and said, "You son-of-a-bitch, I told you to stay away from her or I would kill you." Witness Burk did not hear Akerblade answer anything. Riggle went out and came back in about five minutes and told Frances Williamson that if she did not quit fooling around with this guy, evidently meaning Akerblade, he would kill her. The witness further testified that the defendant was angry and he looked wild.

The witness Joseph Ferguson went to the Top Hat Bar about 6:45 p. m. on March 28, 1953. He sat down at the bar and stayed in that position for about an hour. Mrs. Williamson was in the bar when he came in and Akerblade came in about ten minutes later. Witness saw Riggle at the west end of the bar looking at Mrs. Williamson in a very angry manner. Riggle talked to Mrs. Williamson and apparently objected to the fact that she had been drinking with a Mexican and Mrs. Williamson replied that she did not care whether he was a Mexican; that a Mexican was as good as defendant. Mrs. Williamson as well as defendant, appeared to be angry but neither of them was intoxicated. The witness Ferguson, Mrs. Williamson, Akerblade and Randall left the bar about ten or fifteen minutes before eight o' clock and were standing on the sidewalk outside the Top Hat Bar. Riggle joined them and talked to Akerblade but witness could not hear all that was said. But Akerblade replied, "Anytime." Riggle said to Mrs. Williamson, "As for you, Frances, I am through with you." She answered, "Yes, I am darn glad of it too." They then talked about an incident prior to that time when defendant mentioned the fact that she wanted to go up to his room with him. Mrs. Williamson answered, "I never wanted to go to your room and I am never going to your room." Soon thereafter Frances Williamson, Akerblade, and the witness went over to the Angle Cafe to eat.

The witness Greenlee saw the defendant coming from the north, apparently from the Top Hat Bar, and going around the corner of the Pioneer Drug Company toward the alley to the west of that block, going very fast or running. Two witnesses, Wickam and Ramsey, saw the defendant come from the northeast across the street apparently from the Angle Cafe or in the neighborhood of that. It was approximately eight o' clock or a little after. That testimony was introduced evidently for the purpose of showing that defendant, after he saw Ferguson, Mrs. Williamson, Akerblade and others on the sidewalk in front of the bar, went to see whether or not Akerblade and Mrs. Williamson went to the cafe. Wickam followed the defendant when the latter went around the corner, went as far as the alley. But he did not see the defendant, who evidently had driven off by that time. It appears already stated that the defendant's car was parked in the alley running north and south in the block in which the Top Hat Bar is located. He had a rifle in the back of the car. He got the car, drove north to the next street, namely Maple Street, turned right and drove to the main street of the town, turned south and then just south of the Angle Cafe and parked his car slightly east of the door of the Angle Cafe. That was sometime after eight o' clock. Frances Williamson, Akerblade, Ferguson, and five or six others were in the cafe at the time. Fluorescent lights were on and the cafe was well lighted.

The witness, James B. Angle, who operated the Angle Cafe, testified that he heard a car coming along the alley and being parked near the door. The defendant Riggle came from the car and entered the lunch room. He came to the door and stood there. He had one foot on the threshold. He fired a shot and holding a rifle, Witness heard defendant say, "Damn you, I told you I would get you and now I am getting you." Ferguson

said to defendant, "Tricky, cut it out." The first shot hit Akerblade who staggered back into the arms of Joseph Ferguson and died. It appears defendant drove four bullets into Akerblade. The defendant next shot Mrs. Williamson and drove four bullets into her. She slumped off the stool, fell and died. Soon thereafter Riggle ran out the door and witness saw a car going by the window of the cafe. The car left in a hurry and seemed to jump.

The witness Joseph Ferguson, whose testimony in or near the Top Hat Bar has been mentioned before, was in the Angle Cafe at the time of the homicide of Mrs. Williamson and Akerblade. Witness testified that Riggle arrived at the lunch room at about eight o' clock or ten or fiften minutes thereafter. Witness saw Riggle after the first gun shot. Riggle was standing in the door aiming a gun at Walter Akerblade. He fired the first shot, hesitated, changed his stance and fired the second shot. Akerblade was shot first and Mrs. Williamson second. Riggle said, "God damn you, I told you I was going to get you." Akerblade got up, staggered back, his knees buckled and he fell on the floor and groaned twice and died. Mrs. Williamson raised her head and looked toward the door that was all she did until she was shot. In leaving, Riggle took three steps backward, two sideways and made a quarter turn and got into his car and left. Witness saw Riggle get in his car. The door was open and the motor was running faster than normal. The car was parked with the lights on including the tail light.

Defendant drove east of Wheatland, struck a telephone pole and nearly broke it. However, he drove his car on further until it was stopped in a ravine some miles east of Wheatland. Defendant stated that when he "come to", that is to say when his blackout period ended,

he found himself sitting in his car on a road at point some miles east of Wheatland with the motor turned off and the rifle beside him. He did not know of anything wrong but thought something was wrong because the gun, usually kept full, was almost empty. The defendant abandoned his car, taking with him only the rifle. He went part of the way along a road and then across fields to Wheatland. That was during Saturday night, March 28, 1953. Defendant went into a house which was being built by Willard Perry and stayed during the remainder of the night, all day Sunday, March 29, and all day Monday, March 30. Defendant stated he did not know what happened but that he was afraid and kept the rifle with him. On Monday while Riggle was in the house he heard Charles Perry say, "Clay Riggle sure took out, didn't he, left the country, didn't he?" The testimony of the defendant himself, and of Charles Perry is conflicting from that point on and not consistent. Riggle testified that he stayed in the house until dark. Mr. Doctor came into the house and Riggle stepped out of a closet. Defendant spoke first saying, "Are you scared?" Mr. Doctor said, "No." Defendant then asked Mr. Doctor, "Did I hurt anybody?" Mr. Doctor said, "Yes, you killed them." Defendant then said, "I might as well blow my brains out then." Defendant told Mr. Doctor he wanted to see Charles Perry. Mr. Doctor saw Mr. Perry when then said they would go and see Riggle. Mr. Perry testified as follows:

"Q. Do you remember what the first words were that he spoke to you? A. He asked me what he should do.

"Q. Do you remember what the second thing was he asked you? A. If he had hurt them.

"Q. Do you know — do you remember what your reply was when he asked you, "Did I hurt them?"

A. I told him that they were both killed.

"Q. Do you remember what he said?    A. He said, "Oh, my God."

Defendant was then advised to give himself up and he surrendered to the sheriff of Platte county, Wyoming, about 7:30 p. m. on March 30, 1953.

The defendant's version of what took place in Wheatland, Wyoming on the evening of March 28, 1953, taken largely from the abstract of the record for brevity's sake, is substantially as follows:

On Saturday I felt all right at times. Mrs. Williamson called me at noon Saturday and told me she would be ready to go  that night. She told me to look out the window she was going to burn some trash and if I could look out of my window I would see something. (R-267) I loved that woman and I thought we could make a go of it. I have a dog which is in the care of Mr. Doctor. I was going to take the dog along when we got married. I generally took the dog with me every place I went. I got off work at 5:30 on Saturday. (R-268) I drove to my room and washed and changed clothes, I put on a striped pair of brown pants, a blue shirt, a clean jacket with a fur collar. These were my best clothes. I also had my hat and was going to pick Frances up and go to Lusk. (R-267).

When I came in (into the Top Hat Bar) and saw Mrs. Williamson with these men in the bar, I came in and sat down at the end. She didn't look at me. Then Akerblade left her and I walked over asked her if she wanted a glass of beer. She says "Did you see the bonfire that happened this evening?" I asked her if she was ready to go and she jumped up and said something to Jerry Sparks. Jerry said, "If Tricky don't behave himself I will throw him out." (R-273) I asked Jerry what he

said it for and he said he didn't want any rough stuff that night. I then left and went to my room and ate my supper and then went to the Post Office and got my mail there was a Government check for $3.00 for income tax. I went down to the Top Hat Bar and cashed it. (R-274) I was feeling blue then and I asked her again and she refused. Akerblade and Randall had gotten her drunk on whiskey and beer and I think Elmer Greenlee. I loved her and hated to throw her out. I went back and got my car. (R-275) I thought I could get her in my car and get her away from the bunch that was getting her drunk. I knew she would go so I brought my car around behind the Top Hat Bar and left it there. I went around and there they were standing on the street. That is, Mrs. Williamson, Randall and Akerblade and Dave Rafit. I asked her then and she says, "I don't know what you mean, I don't know what you mean." I left and they started across the street. She wouldn't come with me. I went to my car, sat there a bit and I thought that I would try her one more time. I had come around the Pioneer Pharmacy and gotten my car. (R-276) I started up my car, drove around and up to the door and saw them sitting there laughing. I don't know what happened from then on. I just went to pieces and don't know what happened.

I did not threaten anybody. I had no intention of shooting anybody. When I drove down the alley I thought that they might be at the La Ramie. I didn't know they were at Jim Angle's. I was going to stop and try to get her in the car so we could get started to Lusk. I last remember seeing them laughing before I blacked out.

He testified further that he drove to the cafe and stopped with the lights of the car on and the motor running. He did not know if he left the door open. He

carried the rifle in the back of the car, but did not know when he took it from the back into the front seat. He knew what he was doing until he saw Akerblade and Mrs. Williamson laughing. He looked in and saw them and that is all he remembers. He denied that he had previously gone to see if Mrs. Williamson was at the Angle Cafe. Other facts will be mentioned later.

1. Defense of Insanity.

As stated before defendant pleaded guilty by reason of insanity. The district court accordingly, in accordance with provision of chapter 87, Session Laws of Wyoming, 1951, directed the defendant to be sent to the Wyoming State Hospital at Evanston, Wyoming, for observation. It is now contended that the state failed to prove the defendant was sane but that on the contrary it is clearly shown that he was insane at the time of the commission of the crime charged herein and that he should have been acquitted by reason of insanity.

Three witnesses, namely, Charles Perry, L. P. McGuire, and Dick Doctor testified they considered the defendant to be mentally abnormal, based upon the fact that defendant mumbled to himself, was forgetful, stumbled, fell and so forth after about October 1952.

Two physicians at Wheatland, Wyoming namely, Dr. James G. Allison and Dr. W. H. Collins testified as to the insanity of defendant. Dr. Allison testified that it was possible defendant suffered from psychomotor epilepsy and during that time he would be unable to distinguish between right and wrong. Dr. Collins testified that in his opinion the defendant possibly and probably suffered from psychomotor epilepsy at the time when he killed Mrs. Williamson and Akerblade, and again he stated that he was quite certain the defendant was having a psychomotor seizure at the time

of the homicide. Neither of these physicians had examined the defendant.

On July 21, 1953, the defendant was taken to the office of Dr. Chester B. Powell at Salt Lake City, Utah, for examination. Dr. Powell is a specialist on neurology and neurosurgery. He testified he examined the defendant and made a neurological examination of him on that date for about 45 minutes and that the examination disclosed no brain damage, no brain disease and nothing that would indicate abnormality. His examination disclosed that the actions of the defendant were coordinated which is not true in the case of psychomotor epilepsy. He also ordered an electroencephalogram test which was given by Genevieve Taggert. As we understand it that test is made by an instrument attached to the head of a person which records on paper the electric activity of the brain. Dr. Powell testified that this test disclosed no abnormality on the part of the defendant. He further stated that while such a test taken while the patient is awake is dependable in only one-third of the cases and is more effective when taken while the patient is sleeping, there would be no great additional benefit over and above that taken while the patient is awake.

A hypothetical question was put to the doctor which embraced substantially all the facts which we have heretofore men tioned, including the various injuries which the defendant received during the time he was following rodeos and while he was working for Charles Perry. The facts included in the hypothetical question were agreed upon by counsel for the respective parties, so the facts embodied and favorable to the defendant, should be considered to be fairly accurate. After mentioning the facts that four bullets were fired into the bodies of each of the individuals the doctor stated:

"These shots all struck the object and would indicate an accurate firing, a well-coordinated activity. The individual not only coordinated his activity in this respect, to place the shots accurately but the hypothetical question also states that he changed his stance and that would suggest that an additional adjustment to make the act more effective took place. The individual, therefore, did not appear to be unclear or confused but this would suggest that the mind was functioning clearly."
Again he testified:

"As I say, this would indicate that he was aware of his environment, aware of the surroundings and that his memory was intact for those circumstances within that period. Also, the fact that, as stated in the question, to have left rapidly and to have "gunned" the car, and I believe you said 'thrown up gravel,' indicates to me that he must have had a reason for leaving rapidly, that he was fleeing from an episode and I would interpret that as an evidence that the individual had an awareness of rightness or wrongness about the episode and clearly distinguished it as something wrong."
Again the doctor stated:

"I should say in my opinion, first of all, that the hypothetical question presents no evidence to me in the way of specific seizures, activities, I would interpret as specific psychomotor seizures. It also presents no evidence of organic brain damage in the findings, despite the fact that he had sustained many blows on the head; that there was in the sum total of that evidence on which to make a diagnosis of psychomotor epilepsy."
Speaking of defendant's claimed amnesia when defendant heard laughter, the doctor testified:

"Your question as to whether that could have been the psychomotor seizure, I would say in my opinion that it could not have been for the reasons I have outlined: The patient was aware of his environment at the time and place; he distinguished right from wrong; his movements were coordinated and accurate, and for the additional evidence that I outlined when I discussed those individual points."

Mr. James Sandall is a psycologist employed at the Wyoming State Hospital at Evanston. He examined the defendant while the latter was at the hospital to determine psychosis or mental deterioration and behavior of the patient. He found no mental deterioration and no psychosis. The defendant had no hallucinations or delusions The examination by him disclosed that the defendant was a man of average general ability and there was nothing on the test to indicate any abnormality. Defendant denied he had any blank spells and amnesia at any time other than the blank spell which he claimed at the time of the homicide herein.

Dr. Joseph F. Whalen is the superintendent and medical director of Wyoming State Hospital at Evanston and is a specialist in psychiatry. The doctor took the defendant's life history. Among other things defendant stated to Dr. Whalen, as summarized in the abstract of the record, pp. 89, 90; as follows:

"He then came to Wyoming and worked on ranches and followed the rodeo business and according to his own statement was one of the best in the world; that he had had many write-ups commending his roping ability; that he had never been in trouble in childhood with civil authorities and had gotten along well with most people. He stated that he had served a term in the penitentiary for attempt of murder for which he received a sentence of 5 or6 years but that he served about 31 months. He didn't think it was just and that he had a fight with a peace officer over a woman. (R-532) He said that the peace officer attacked him without provocation and that he was defending himself during this shooting. He said he didn't like the penitentiary but he cooperated with us. He was likeable and most cooperative. He would drag his left leg and said he had organic brain damage. He said he thought it was due to his acquiring syphilis in 1942 and later treatment in 1946. He did not indicate any serious illnesses or injury. (R-533) He had a hernia operation and had his tonsils

and adenoids removed. When he was 27, he said he married a woman and after 4 months found that she was not divorced from her previous husband. He said that most of the trouble he had gotten into had resulted from dirty deals from women.

"His physical examination was negative. He had some bad teeth and a hernia on his right side. He was in excellent condition physically, but appeared to be older than the stated age. He said he was charged with the crime of shooting 2 people; that he had been associating with this woman who was of low character but he liked her and wanted to marry her. (R-534) She called on him at all hours of the day and night demanding money from him; she kept him broke; she threatened to charge him with rape; that he found her out with other men but that he was jealous and enraged and at times didn't know what he was doing.

"The date defendant and the woman agreed on a date to be married but on the evening of the date intended, he found her drinking with another man. She refused to go with him. He stated that he went home, had his supper and came back trying to persuade her to go with him. He got the gun from his car that he usually carried for hunting and intended to scare the woman and the man and then everything went black until he came to in his automobile in the canyon. He went to the house under construction and hid and that he didn't know what had happened until he heard a workman talking about it. It was a day or so afterward that he found out that he had killed 2 people. (R-535) He called for some friends and his employer and in their company surrendered himself to the authorities."

The doctor made a psychiatric examination of the defendant and testified that the defendant was well oriented in the three spheres, that is, time and place, who was he, where he was and why he was there and without delusions. The defendant had no hallucinations, his memory was good, his recall was good and his memory for past and recent events was good. He was an essentially normal person without psychosis or mental

disease and was discharged back to the sheriff. In answer to the question whether the defendant suffered from pyschomotor epilepsy the doctor answered: "1 would say that after a period of observation with no evidence of any conclusive disorder or attacks were observed by trained personnel, with the negative brain wave and with a negative neurological examination; there is no evidence whatever of any psychomotor attacks over a period of that time, that he wasn't in an attack and did not do this (commit the homicide) in an attack of psychomotor epilepsy."

We could go into the evidence in this connection in greater detail but we can see no good purpose to be subserved by doing so. To set it out in detail would make a book in itself. Counsel for the defendant bitterly complain that Dr. Powell did not have an electro-encephalogram test made while the defendant was asleep. It must, however, be remembered that in addition to that test, Dr. Powell made a neurological examination of the defendant for about 45 minutes and the electroencephalogram test was only part of the examination made. From examination of the testimony heretofore set out, without going into any greater detail, it is quite apparent that the jury, who were the judges of the facts, were fully justified in finding the defendant sane when he committed the crime with which he is charged.

2. Sufficiency of Testimony as to Premeditation.

It is contended by defendant that the evidence in the case fails to show any premeditation or deliberation to commit the homicide in question here; that the evidence shows that from the time the anger of defendant was aroused there was neither time nor opportunity for defendant to cool. State v. Rouse, 58 Wyo. 468, 134 P.

2d 1116, is cited which does not help the defendant in this case. The court in that case sustained a verdict of first degree murder. It is said by counsel that defendant was angry and overwrought at the time of the shooting; that it is not likely, if the defendant had intended to kill, he would have driven down Wheatland's main, lighted street and stopped under a light in front of the Angle Cafe. We do not think it is necessary to discuss the question of premeditation and deliberation extensively in view of the evidence which we have heretofore set out. Counsel for defendant seem to have forgotten that we are not the trier of facts. It was for the jury to weigh the evidence in the case. It is quite apparent from the state's testimony that defendant became jealous, angry and excited close to or very shortly after 6 p.m. of the day the homicide was committed and remained so to the time of the homicide. He had two hours or more to deliberate and think upon whether or not he should permit his anger to go to the exent of committing the homicide in question. According to the state's evidence, he showed a homicidal disposition soon after six o'clock in the evening when he stated he would kill the bartender if he should attempt to evict him from the Top Hat Bar.

According to the testimony of the witness Burk, defendant threatened to kill Akerblade and Mrs. Williamson about 7:30 p.m. He had about three quarters of an hour to deliberate as to whether or not he would carry out his threat. Counsel for defendant say the testimony of Burk is thoroughly discredited because of the fact that the coroner testified that when he asked, at the coroner's inquest, whether or not anyone had threatened to kill the deceased all the witnesses at the inquest answered, "No," and that while there might be some doubt about it he felt satisfied that Burk was one of those who gave that answer. The jury were not required

to find that Burk's testimony was discredited. It is in complete harmony with that of James Angle and Joseph Ferguson heretofore set out. Nor were the jury required to believe that the defendant's fatal anger was caused by the fact he saw Akerblade and Mrs. Williamson in the Angle Cafe and heard them laugh and that then his mind went blank. According to his own statements this had never occurred to him before. The jury were entitled to believe under the evidence that defendant got his automobile, which had a rifle in the back of it, for the specific purpose of finding and killing both of the deceased. He had plenty of time to cool and deliberate during the period when he was driving to the Angle Cafe. The facts heretofore mentioned together with the fact that he shot each of the deceased, that he shot no one else who was in the cafe, that he shifted his position so as to be sure apparently that he would shoot no one else, fully justify, we think, the jury in returning the verdict which they did.

3. Photographs.

Counsel for defendant complain of the admission in evidence of photographs which were taken in the cafe showing a row of stools and a part of the lunch counter and both of the deceased lying on the floor. We have examined these photographs. They are not of a character as to inflame the passions of the jury. They shed some light on what actually took place in the cafe. It was not error to admit them in evidence. State v. Lantzer, 55 Wyo. 230, 99 P.2d 73; State v. Goettina, 61 Wyo. 420, 158 P.2d 865; Eagan v. State, 58 Wyo. 167, 128 P.2d 215.

4. Defendant's Testimony As To His Own Soundness of Mind.

Thedefendant when on the witness stand was asked whether in view of his spells and head injuries he was

suffering from some sort of mental derangement. He answered. "Yes, sir." An objection was made and the court stated it was not redirect examination. The answer was not stricken and no exception was taken to the action of the court. It is stated in 22 C. J. 599: "For obvious reasons a witness cannot be permitted to testify to his own mental soundness or unsoundness." See also 32 C. J. S. § 506, p. 168. We accordingly find no error.

5. Defendant's Feelings.

The defendant was asked the following questions:

"Q. Mr. Riggle, do you know now that you held a gun and fired the fatal shots? A. Well, as far as personally knowing, no, I don't.

"Q. How do you feel about it? A. Well, you just—I can't suggest, can I ?"
The prosecuting attorney asked what was the compentency and the court sustained the objection. No exception was taken by defendant. The answer of the witness was not stricken and remained for the jury to consider it. No offer was made to show any particular feeling of defendant so we do not know what was expected to be shown by him other than what he stated. Possibly counsel expected the defendant to state that he was sorry but that would not help the defendant. It was too late. We see no error in this connection.

6. Stating All Of A Conversation.

The defendant was asked when on the witness stand:

"Q. Now, when you found Mrs. Williamson with these men in the bar, what did you do? A. Well, I came in first, before I noticed her--the bar comes up and makes a turn--and I come in and sat down here (indicating) because I was in a hurry. Though I was on the end I looked up and she was sitting over there. Well, then when she looked up and seen me she just dropped

her head, her eyes like that (indicating). She didn't look at me then;she acted like she was ashamed. I sat there—I bought me a glass of beer then. So, finally, right when Akerblade left her I walked over and I said, 'Do you want a glass of beer?' I bought her and myself a glass of beer. Then she says, 'Did you see the bonfire that happened this evening?' "

The prosecuting attorney objected to the evidence as being incompetent and as being a conversation with a deceased person. The court stated, "Same objection." Exception was taken. Error is assigned in this connection as it is claimed that this was part of the conversation to which the witness Joseph Ferguson had testified and that the defendant was entitled to show all the conversation which was had at that time. It is an elementary rule that where part of a conversation is put in evidence the adverse party is entitled to prove the remainder of the conversation. 26 Am. Jur. § 316, p. 369. Whether it was in fact a part of the conversation to which the witness Ferguson testified is not at all clear. However the testimony was proper if for no other reason than to show the state of mind of the defendant at that time and the objection of the prosecuting attorney was not valid. What the court meant by stating "Same objection" we do not know. Whether the court meant to sustain the objection or not we do not know. In any event the evidence was before the jury and not stricken. We cannot accordingly say the defendant was prejudiced by the statement of the court. 7. Presence of Defendant at Conversation.

When the witness Sparks, the bartender at the Top Hat Bar, was on the witness stand he was asked whether or not any complaint was made to him by any one and stated a complaint was made by Mrs. Williamson. An objection was made that it was hearsay unless the conversation was definitely in the presence of the

defendant. The state then showed that the defendant was six feet away. So the question was repeated as to who made the complaint and the witness answered that it was Mrs. Williamson, and that she asked the witness to throw the defendant out because he was bothering her. No objection was made to this testimony. Furthermore it would seem that as a matter of fact the defendant heard the complaint although he evidently misunderstood the answer of Sparks. It is shown by one of the witnesses for the state that defendant stated he would kill the bartender before he could reach the defendant to throw him out as already heretofore stated. The assignment of error in this connection is accordingly not well taken.

8. Payment to Dr. Powell.

The witness Dr. Powell was asked as to whether or not he was usually paid a fee for giving his testimony and he answered in the affirmative. He was then asked as to what arrangements he had made with Platte county as to compensation which he was to receive. That was objected to as incompetent, irrelevant and immaterial and the objection was sustained. It is contended this ruling was reversible error and that defendant was entitled to be informed of the amount of money which Dr. Powell was to receive for his testimony. It has been held and recognized that it is proper to permit cross-examination tending to elicit the amount of compensation received by a witness from the party by whom such witness is employed and for whom he testifies. 70 C.J. 976, which among other cases, cites our own case of Pullman Co. v. Finley, 20 Wyo. 456, 125 P. 380. See also 70 C.J. 977, relating to compensation to be paid to a physician. It would accordingly have been perfectly proper if the witness had been required to answer the question he was asked. Whether or not, however, the

rule of the court was reversible error is another question. In Flick v. Ellis-Hall Co., 138 Minn. 364, 165 N.W. 135, the court held that the extent to which, upon cross-examination, inquiry may be made concerning a witness' pecuniary interest in the claim in litigation is left to the sound discretion of the trial court. See similar in effect Crutchfield v. Davidson Brick Co., 55 Cal.App.2d 34, 130 P. 2d 183

In Mason v. Alabama Iron Company, 73 Ala. 270, it is held that the amount of salary paid a person, who testifies in the case, by his employer is not a fit subject of inquiry. In State v. Panchuk, 53 N.D. 669, 207 N.W. 991, 993, the court held that whether or not to require a witness to state the amount of compensation is within the discretion of the court. The court stated as follows:

"It is always permissible to prove facts and circumstances tending to show the bias or prejudice of a witness. Ordinarily the cause or the particulars of such bias are not legitimate subjects of inquiry, except so far as the trial court, in exercise of a sound discretion, permits. In the case at bar it appears, without dispute, that the witness was in the employ of the state for the purpose of collecting evidence of violations of the Prohibition Law.

Counsel for the prisoner was not satisfied to establish this fact, but desired to prove the amount of the compensation. There is no offer of proof either as to the amount of the compensation, or as to whether such amount was in any manner contingent upon the outcome of the prosecution . Undoubtedly the discretion of the trial court should be liberally exercised to the end that the jury may have before it every fact tending reasonably to disclose any circumstances which, if present, may cast doubt upon the existence of that wholly disinterested frame of mind essential to complete confidence in the candor of a witness. The defendant has a legal right to show that a witness for the state is prejudiced against him. State v. Hakon, 129 N.W. 234, 21 N.D. 133.

The extent of the inquiry, however, is largely within the sound discretion of the trial judge, and his conclusion in that behalf will not be disturbed unless it appears that the ruling amounts to an abuse of discretion. Upon the whole record we do not feel justified in holding that the trial court abused its discretion in excluding the amount of the compensation. See State v. Long, 115 A. 734 , 95 Vt. 485."

The point here involved is considered at great length in the case of State v. Long, 95 Vt. 485, 115 A. 734, 735, 736, in which the court arrived at the same conclusion as the North Dakota court heretofore mentioned. The court stated as follows:

"It is always permissible to show the interest, bias, or prejudice of one who testifies in court. But the cause or particulars thereof are not proper subjects of inquiry (State v. Glynn, 51 Vt. 577; Bertoli v. Smith, 69 Vt.425, 38 Atl. 76) except so far as the trial court, in its discretion, may allow (State v. Baird, 79 Vt. 257, 65 Atl. 101; Dionee v. American Express Co., 91 Vt. 521, 101 Atl. 209). It was held in Taylor v. State, 121 Ga. 348, 49 S. E. 303, that a witness having testified that he was an employee of the murdered man, the terms of his employment were irrelevant and inadmissible. In Beauchamp v. State, 6 Black. (Ind.) 299, the respondent in a murder case was allowed to show that the son and widow of the deceased had employed counsel to assist the prosecuting attorney; but it was held that the question whether this contract was on a contingent fee or not was properly excluded. In Ball v United States, 163 U. S.  662, 16 Sup.Ct. 1192, 41 L.Ed. 300, the court permitted counsel for th e defendants below, in cross-examination of material witness for the prosecution, to ask if they had employed counsel to assist the district attorney, and they admitted that they had, but the court refused to allow them to inquire how much they paid such counsel, and this ruling was sustained. State v. Carroll, 85 Iowa 1, 51 N.W. 1159, supports the respondent's contention. There were in that case, however, special circumstances casting suspicion on the character and reliability of the detective, and we do not regard the

case as a safe precedent to follow. * * * That the case cited was not intended to mean any more than is above indicated is shown by the result. There, the witness had testified that he was a detective, and was to receive compensation for his services, and that his pay did not depend upon a conviction inthe case. It was held that it was not error to refuse to allow the witness to be examined as to the amount of his salary. There was no showing in the case in hand, nor offer to show, that Wood's pay depended upon a conviction, and the exclusion in question was within the trial court's discretion."

### 9. Cross-examination in Connection with Prison Record.

The witness Charles Perry, testifying on behalf of the defendant, stated he had known the defendant since about 1946 and that the defendant's reputation for truth and veracity was good. Thereupon on cross-examination, the prosecuting attorney asked the witness whether or not the defendant had been in the penitentiary from 1946 to 1949. That was objected to by counsel for the defendant and is claimed to be reversible error. The character of the defendant cannot be attacked by the state if it is not put in issue by the former. Anderson v. State, 27 Wyo. 345, 196 P. 1047. Unfortunately counsel for defendant were responsible for inviting an attack thereon. The reputation for the truth and veracity of the defendant was not a relevant issue as hereinafter more fully shown. Only a particular trait pertinent in a case can be shown by the defendant -- in the case at bar the trait, for instance, of a peaceful person. 22 C.J.S § 677e, p. 1074. Nevertheless the defendant put his character in issue in the respect mentioned. The state then had a right to inquire into the extent of the knowledge of the witness as to this reputation, which would include the length of time, if not too remote. 71 A.L.R. 1514b. Thus it is said in 58 Am. Jur. §657, p. 363:

" witness may be cross-examined as to the ground of his knowledge or opinion, such as his acquaintance with the person as to whose reputation he has testified, his opportunities for acquiring information."

In People v. Sambrano, 32 Cal.App.2d. 200, 91 P.2d 221, 230, the court stated:

"The rule is well established that, in the absence of bad faith, a witness who has sworn to the good reputation of an accused person for peace and quiet or for truth, honesty and intergrity, may be asked on cross-examination whether he knows of and takes into consideration specific acts and conduct inconsistent with the reputation attributed to him, when such acts actually occurred or when the examining attorney, in good faith, believed that the defendant was guilty of them. People v. McKenna, 11 Cal.2d 327, 335, 79 P. 2d 1065; People v. Stevens, 5 Cal.2d 92, 99, 53 P.2d 133."

True, the witness might have been simply asked as to whether the defendant was in Wheatland, or neighborhood, during 1946 to 1949, but the fact that the defendant was in prison during that time would make the fact clear. And we cannot say that the question asked was not asked in good faith.

Assuming, however, that the prosecuting attorney should not have asked the question in the manner in which he did, the ultimate question after all is whether or not it was prejudicial. In the first place, the defendant actually became a witness after Charles Perry had testified and it would not have been improper to have asked the question above mentioned on cross-examination of the defendant. It was not asked when the defendant took the witness stand, but we think we may assume it would have been asked if the fact had not already appeared in the testimony of Charles Perry. So it is merely a question of time as to when the fact invol-

ved would have appeared. In the second place, the defendant told all about the fact of having been in the penitentiary when he talked to Dr. Whalen as hereinbefore fully set out. True, it does not appear that the defendant had been warned that the evidence might be used against him. But it does not appear that any compulsion was used when defendant made the statement. It was merely a collateral fact, not an admission of his guilt of the crime charged herein, and no warning was necessary if, as a matter of fact, the evidence was voluntarily made as appears to be true in the case at bar. 22 C.J.S. 1252; State v. Osmus, 73 Wyo. 183, 276 P.2d 469; Strand v. State, 36 Wyo. 778, 252 P. 1030.

What we have said is irrespective of the fact that when a defendant pleads insanity, he opens up his whole life. This was discussed at some length in State v. Carroll, 52 Wyo. 29, 69 P.2d 542. Thus it is stated in Underhill's Criminal Evidence, 4th Ed., P. 606, that, "the fact that defendant has been previously convicted is competent to prove mental condition."

In view of the facts herein, we think it is clear that no prejudice resulted to the defendant by reason of the question herein discussed.

10. Nonexpert Witness as to Insanity.

The witness Charles Perry testified that the defendant had worked for him at the lumber yard for 3 or 4 years and he had observed his conduct during that time . He was asked:

"Q. Mr. Perry, based on your observations and experience as to which you have testified before this, would you state to the court your opinion of Mr. Riggle's mental condition at nine o'clock on the morning of March 28, 1953, at which time you testified you had seen him."

The question was objected to for the reason that no proper foundation had been laid and the objection was sustained. The objection was not well taken. The witness might well have been permitted to answer. State v. Rumble, 81 Kan. 16, 105 P. 1; 25 L.R.A. NS. 376. A man who has worked with another for a period of 3 or 4 years should be well qualified to state the mental condition of such another. However, the question was rather vague and uncertain. The mental condition of a man in and of itself is not of any great importance in connection with a charge such as is involved in this case. We all, on the morning of a certain date, may be gloomy, depressed, joyful or happy or the contrary. That is a mental condition but in itself does not mean much to elucidate a case such as we have before us unless the mental condition shows or at least borders on the abnormal. The question itself asked to witness Perry does not show that an abnormal mental condition was sought to be shown.

Two workmen at Perry's lumber yard testified that they considered the defendant mentally abnormal. One of them stated he could not say as to sanity, but that the defendant was mentally abnormal. While we do not know what the answer of the witness Perry to the propounded question would have been, we surmise this is all the witness would have testified to if he had been permitted to answer. As a matter of fact while the witness was not permitted to answer the question put to him categorically, he actually testified to the fact that Riggle was mentally abnormal and that there was something wrong with him. (Abs. 34) The witness stated that Riggle appeared angry on the morning of March 28, 1953; that he was mumbling to himself and that witness asked him if there was anything out of the way in asking him to measure the windows and defendant answered, "Why no, Charles"; that Riggle measured

the windows but made a mistake in connection with all of them and that was not a normal mistake for him to make. He further stated that later in that day Riggle was happy he had made a good sale during the day and was feeling pretty happy about it. The mental condition of Riggle on March 28, 1953, was accordingly shown by the witness. An answer to the categorical question would have added little if anything. We are cited to Statev. Cooper, 70 N.C. 719, 87 S.E. 50, 8 A.L.R. 1214; Hall v. State, 78 Fla. 420, 83 So. 513, 8 A.L.R. 1234; State v. Schneider, 158 Wash. 504, 291 P. 1093, 72 A.L.R. 571. In the Schneider case the witness was asked whether or not the defendant was in his right mind. In the Hall case the witness was asked, "Was he of sound or unsound mind, sane or insane, for several months before the killing?" In the Cooper case the witness was asked whether or not the defendant knew right from wrong. In these cases accordingly direct attention was called to the fact as to whether or not the defendant was sane or insane. That is not true in the case at bar and distinguishes this case from the cases cited.

Counsel for the defendant now argue the matter before us as though they had expected to show by the witness that the defendant was insane on the morning of March 28, 1953. A nonexpert witness may be permitted to testify to the insanity of another. 20Am.Jur. §§ 852, 853, pp. 713, 714. A distinction is made in this connection. A lay witness may express his opinion that a person is sane, but he may not say that a person is insane without specifying the facts on which he founds his opinion. 23 C.J.S. 102, note 65. The question put to the witness Perry does not itself, as already stated, indicate that the defendant expected to prove by the witness that the defendant was insane. No offer of proof was made, so we are in the dark as to what the

defendant actually would have answered. It is stated in 23 C.J.S. § 880, pp. 100, 101:

"When the opinion of a nonexpert witness is received, the facts and circumstances upon which he bases his opinion or conclusion should be stated as far as is practicable, in order that the jury may have some basis upon which to test the value of his opinion. Such facts are admissible; and, where they are not shown, the opinion or conclusion of the witness, may be inadmissible; but where such facts are in evidence, it may not be error to receive the opinion or conclusion of the witness, although, on the other hand, it may be proper or not erroneous to exclude the opinion or conclusion, as where the jury are able to draw their own conclusion from the facts."

In 32 C.J.S. § 507, p. 174, it is stated:

"The relevant opinion of a qualified lay witness as to sanity or insanity, or soundness or unsoundness of mind, is admissible where he states facts and circumstances which are sufficient, or amply sufficient, to constitute a reasonable basis for his opinion. On the other hand, where the facts stated are not sufficient, in the opinion of the court to give a reasonable basis or any basis for the opinion or inference, or sufficient admissible facts are not clearly stated, the witness may be rejected as incompetent and his opinion excluded."

See State v. Schneider, 158 Wash. 504, 291 P. 1093, 1096, 72 A.L.R. 571; Zander v. Cahow, 200 Iowa 1258, 260 N.W. 90; In re Mott's Estate 200 Iowa 948, 205 N. W.770. In the case at bar the witness Perry testified that on the morning of March28, 1953, the defendant was angry; that he mumbled to himself, which is not unnatural for an angry person; that defendant made mistakes in measuring windows, which was not a normal mistake for defendant, but which would not be abnormal for a man who is angry; that later in the day the defendant was happy because of some fine sales which he had made in the day. We think it is clear that

this did not constitute a sufficient basis for the witness to express his opinion that the defendant was insane on the morning of March 28, 1953. We conclude accordingly that the record fails to disclose any prejudicial error in the matter here discussed.

11. Instructions.

A number of objections are made in connection with the instructions of the court. One point urged time and again is the fact that the court made interlineations. We know, of course, the reason for that. The trial judge had forms of instructions which fitted the ordinary case of homicide but not the case at bar. Not alone did the defendant plead not guilty but not guilty by reason of insanity. The forms which the trial judge had with him did not make any reference to the question of in sanity so that most of the interlineations which were made referred to that matter. It would doubtless have been better if the court had caused the instructions to have been retyped, but we hardly think the jury was in any way misled or that th e defendant was harmed by the interlineations.

Counsel complain that the court used the term "chimerical" in instruction 4. In instruction 2, the court stated that "no juror should permit himself to be to any extent influenced against the defendant because of or on account of the Information in this case." Objection is made to the term "to any extent." The court also instructed the jury that "the information in this case is of itself a mere accusation or charge against the defendant, and is not of itself any evidence of the defendant's guilt." Objection is made to the term "of itself." Objection is also made that thecourt did not define murder in the first degree in the terms of the statutes in that the question of robbery, poison, etc., was left out. In instruction 11 the court among other

things told the jury "If the defendant intentionally killed the deceased with a deadly weapon without such provocation as was apparently sufficient to excite in him an irresistible passion and such killing was not in self-defense * * *." Objection is made to the reference of self-defense when no question of self-defense was involved. Objection is also made that instruction 5 i sa useless duplication of instruction 4.

Objection is also made that in part of instruction 20 the court used the subjunctive mood instead of the indicative mood. All the foregoing objections are matters of little or no importance, were not harmful, and are not cause for reversal of this case. We have mentioned them merely so it may not be thought that we have not given every objection of defendant the most careful consideration.

12. Instruction Asked.

The defendant objected that the court did not give asked instruction 20 reading as follows:

"You are instructed that premeditated malice requires that there should be time and opportunity for deliberate thought, and that after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act.

"Without premeditated malice there cannot be murder in the 1st degree.

"To determine if there has been sufficient time and opportunity for deliberate thought and meditation to lay a plan for murder, you are permitted and instructed to take into consideration the mental capability of the defendant. You are instructed that it is common knowledge that a person of superior intelligence whose mind is alert and keen would require less time to lay a plan for murder than one whose mind is less alert and less keen."

Emphasis is made upon the fact for the defendant having time to make a plan. We think the matter was sufficiently covered in instruction 9 of the court which stated among other things:

"It requires that there should be time and opportunity for deliberate thought, and that after the mind has conceived the thought of taking life, the thought is meditated upon and a deliberate determination formed to do the act. This being done, it makes no difference how soon afterwards the fatal resolve is carried into execution. There need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation."

We think the instruction by the court stated the correct rule of law and sufficiently covered the point insisted upon by defendant.

13. Instructions — continued.

In instruction 16 the court, among other things, instructed the jury as follows:

"And although you may believe that the defendant is in some manner a victim of mental disease, or is insane, as it is said, nevertheless, if the evidence convinces you beyond a reasonable doubt that at the time of the shooting, he knew and understood the nature and probable consequences of his act and knew that it was morally wrong or forbidden by law, and furthermore, that, at the same time, he had sufficient power of will to enable him to control his acts and to repress the impulse to kill his victims, then I charge you his insanity will not constitute any legal excuse for his act, and you should treat the case as though no evidence of insanity had been introduced."

The phrase "or is insane, as it is said" is the particular phrase to which objection is made and it might very well have been omitted or somewhat changed. However, the instruction is an exact copy of the instruction given

in Flanders v. State, 24 Wyo. 81, 98, 156 P.39, 42, 44. Answering the same objection in that case as is made in the present case, the court stated:

"The last paragraph of instruction 14 is also objected to. We fail to discover wherein it is erroneous. By it the jury was told, in effect, that insanity to a certain degree was not such insanity as would excuse the defendant. If the jury was satisfied beyond a reasonable doubt that, notwithstanding such mental condition, he knew and understood the nature and consequences of his act, and knew that it was morally wrong or forbidden by law, and, furthermore, that he had sufficient will power to control his acts, then such partial insanity would not constitute a legal excuse for his act. That in substance, we believe to be the rule of law in such cases."

14. Instruction on Motive.

The defendant requested an instruction to the effect that if the jury should find the defendant had no motive for taking the lives of the deceased parties, they might take that fact into consideration in determining the sanity or insanity of the accused. The court did not give this instruction and the refusal is assigned as error. The instruction was not, we think, applicable to the facts in this case. It seems that in New York an instruction on motive should be given. People v. Sangamino, 258 N. Y. 85, 179 N.E. 267. But that does not seem to be the general rule. In Evans v. State, 199 Ind. 55, 155 N.E. 203, 206, the court stated:

"As it was not essential that a motive for the crime be established, it was not necessary that the court instruct as to motive." And the Oklahoma court in Griffin v. State, 79 Okl.Cr.App. 85, 151 P.2d 812, 815, held that such an instruction is properly refused "because a man is not to be acquitted of crime simply because his motive for perpetrating it cannot be discovered." The case cites State v. David, 131 Mo. 380, 33 S.W. 28. See

also State v. Eisenstein, 72 Ariz. 320, 235 P.2d 1011, 1022; 23 C.J.S. § 1198, p. 749, notes 60, 61. We can readily see if no motive whatever is shown for the perpetration of a crime that it might benefit the defendant if the jury were instructed on motive. But in the case at bar motive has been amply shown and we are unable to see how the requested instruction could possibly have helped the defendant in any way.

15. Remarks of Court.

The defendant bitterly complains of the attitude of the court in the case and the frequent remarks made by it in connection with the admissibility or weight of the evidence, and the attempt to hurry counsel for defendant because of some witnesses for the state who were waiting to testify. They cite us to the case of Kent v. State, 53 Okl.Cr. 276, 10 P.2d 733, 734, where the court stated: "Trial courts should proceed with dignity, rule with impartiality, and say as little as possible in the trial of criminal cases." That of course was a wise statement. Convictions have not infrequently been reversed because the trial judge talked too much. What has been said is particularly applicable in a first degree murder case, a conviction in which is almost universally appealed, so that the appellate court is often called upon to determine what constitutes prejudicial error. That is frequently a delicate question, the courts being inclined to resolve a doubt in favor of defendant, and trial judges should make an attempt so that matters of that kind arise but infrequently.

The court in this case referred to 'the woman whom the defendant had shot." That remark is claimed to be prejudicial error and we are referred to a case in which the court held that a trial judge's reference to "murder" is prejudicial error. The evidence in this case is clear, and is hardly disputed, that Mrs. Williamson

was "shot" by the defendant. The remark of the court was, accordingly, not prejudicial.

Defendant, when on the witness stand, testified he cashed a $50 check so he would have money to take Mrs. Williamson to Lusk in order that they might be married. The court, when objection was made, stated: "Well, I don't know as it has any relevancy in this case particularly, but we will let it go in." That remark is claimed to be reversible error. The statement should not have been made. The court has no right to pass upon the weight of the testimony. However, the check for $50 was admitted in evidence and, if we understand the record, it was passed around and examined by the jury so the remark of the court was, we think, harmless.

The witness James Angle was asked, "Q. Are you certain, however, that the man which stood at the doorway was Mr. Riggle? A. I am, certainly I am.

Q. How certain are you?" That was objected to as a conclusion. Then the court stated: "Well, he said he is certain, Milt. That is as strong a word as you can use." Objection is made that the court was passing on the weight of the evidence. We think that is true. The trial court should not attempt to conduct the case. We think, however, that the remark was not prejudicial.

The court engaged in a lengthy controversy with counsel for defendant when the latter was testifying to his life's history, and attempted to hurry counsel because the physicians called by the state were waiting to be called to testify. The impression was left that the court thought the testimony of little importance. That of course was wrong. The plea of insanity made relevant all the incidents of defendant's life from the cradle to the time of the trial. State v. Carroll, supra.

However, we have examined the record and so far as we can tell, the defendant was permitted to testify to the various incidents of his life which his counsel deemed of sufficient importance. We cannot hold that every misstep of the trial court is reversible error. We think that no harm resulted from the court's action.

16. Remarks of Court Continued.

The trial court discussed the matter of the reputation for truth and veracity of the defendant in connection with the testimony of Charles Perry and stated in substance that if its attention had been called to the matter, testimony as to the reputation for truth and veracity of the defendant would not have been admitted in this case. That statement of the court is charged as reversible error herein, counsel contending that the testimony was proper. The authorities appear to be to the contrary, when, as in the case at bar, no attack had been made on defendant as to the trait in question.

We have mentioned previously that only the particularly pertinent trait involved in the case is relevant. It is stated in 2 Warren on Homicide, Perm.Ed., p. 329: "And where he (defendant) offers himself as a witness, he cannot prove his general reputation for truth and veracity unless evidence has been introduced tending to impeach him." See also 70 C.J. § 981, p. 788.

In People v. Cowgill, 93 Cal. 596, 29 P. 228, 229, the court stated:

"It appears from the statement that at a certain stage in the trial the appellant, 'in the absence of the jury', offered to introduce before the jury, 'upon their return into court', certain named witnesses, and 'to prove by each of said witnesses that he is well acquainted with defendant, and has known him intimately for many years; that each of them is well acquainted with his reputation for truth, honesty, and integrity, and that it is good; and they would give him full faith and

credit upon his oath in any case.' The court, upon objection, 'excluded said testimony, and refused to permit the jury to hear the same,' and appellant excepted. Assuming that there was anything before the court to rule on, the ruling was clearly right. Appellant did not offer to prove good reputation for the traits of character involved in the crime charged. It is true that appellant was a witness in his own behalf; but evidence is not admissible to prove that the character of a witness for truthfulness is good, unless the opposite party has tried to impeach him by showing that his general reputation is bad."

In State v. Shuman, 89 Wash. 9, 153 P. 1084, 1087, the court stated in part as follows:

"Touching the second question, the record shows that the state had not introduced any evidence impeaching the appellant's character for truth and veracity. A witness may be impeached by showing that he has a bad reputation for truth and veracity and this may be met by proof that his reputation in that respect is good. But one cannot bolster his own testimony by showing that his reputation for truth is good until that reputation had been questioned. The oaths of compurgators as an independent defense is obsolete. 1 Bouvier's Law Dictionary, p. 577, 3 Blackstone, Com. 341. In the absence of any attack upon his reputation as an officer or upon his character for truth, the evidence of his general good character as a citizen, or as to the particular trait called in question by the charge against him was all that the appellant had the right to offer. 3 Encyc. of evidence, pp. 20, 21; State v. Surry, 23 Wash. 655, 63 Pac. 557. That evidence, as we have seen, was admitted."

It is clear accordingly that the error here charged is not well taken.

17. Excusing Court Reporter from Attendance.

On May 22, 1954, some five months after the trial, two of the counsel for defendant made a so-called "Application for Entry of Proceedings", duly sworn to. In that application the affiants state that after the

case was duly submitted to the jury, the court reporter was excused from attendance, and took his notes with him. Affiants further stated:

"That after said matter was submitted to the jury and before they returned their verdicts, the jury requested the Court to advise them what the testimony was relating to the first statements made by the defendant to one Benjamin O. (Dick) Doctor on first meeting the said Dick Doctor after the alleged shooting, and particularly whether the defendant first said, 'What did I do?' or 'What shall I do?'
"That the jury's request for information was denied.
"That thereafter and before the jury returned their verdicts, the jury further requested of the Court that they be advised of the power and authority of the board of pardon and parole.

"That the jury's request for this further information was also denied."
The applicants asked that the facts alleged be made a part of the record in the case.

On the same date, the court entered an order denying the request. We do not know the reason for that — whether the court thought the statement to be untruthful or inaccurate, or whether the court had some other reason. The action of the court is assigned as error. The state has argued the matter as though one similar to that had taken place, and we shall do likewise.

(a) The defendant assigns as error that the court reporter was excused from attendance after the case was submitted to the jury. We are told by the state that the reporter was excused by reason of sickness in his family and that counsel for defendant consented to, or acquiesced in, the action of the court. If that consent was given, then the defendant cannot complain. People v. Casey, 79 Cal.App. 295, 249 P. 525 250 P.653. We find no denial of that fact, but since counsel for defendant have argued the matter, we shall consider it.

We are cited to § 1-624 W.C.S. 1945, reading as follows:

"Such reporter shall be in constant attendance upon the Judge of said Court at all times, and shall be the clerk and stenographer of the Judge, and he shall be sworn to the faithful performance of his duty, and take the oath of office required in the Constitution of this State, and shall remain in attendance on the Court, and take full stenographic notes in cases tried during said attendance, of all testimony or admissions made by either side, objections to the introduction of testimony, the ruling of the Court thereon, the exceptions taken thereto, and such other proceedings as the Court may direct, * * *."

We do not think this provision necessarily requires the attendance of the reporter after the parties rest, although, of course, it is highly inadvisable to excuse him until the verdict has been returned, especially in a case like that at bar. The fact he was excused is in itself, of course, of no importance. It would become of importance only if his attendance was thereafter required. The facts alleged do not indicate that to be true.

(b) The remaining matters relate to the questions asked of the court by the jury during their deliberations. We are cited to § 3-2412 W.C.S. 1945, reading as follows:

"After the jurors have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court, where information upon the matter of law shall be given; and the court *may* give its recollection as to the testimony on the points in dispute, in the presence of, or after notice to, the parties or their counsel." (Italics ours.)

In a criminal case involving a felony, the presence of the defendant in court would be required. 23 C.J.S.

§ 972, p. 303. We are not informed as to whether defendant or his counsel were present at the time when the jury asked the questions referred to in the foregoing application, so we cannot, for that reason alone, say the court should have answered the jury.

The law as to the power of the Board of Pardons and Parole was not a matter of law applicable in the case before us. We so held in State v. Carroll, supra. We discussed the point in that case at length and ruled against the contention that the court should have informed the jury in that connection. We need not go over that matter again.

We pass, then, to the complaint that the court did not advise the jury whether the first words said by the defendant to Dick Doctor were "What did I do?" or "What shall I do?" Counsel for defendant did not choose to have Dick Doctor testify to the matter. We have only the testimony of the defendant. We have searched the record in vain and have not found that either of the questions were asked of Dick Doctor. The court then would have been in error to have answered as purportedly requested. Either the jury or the applicants were wrong in this connection. The record shows that the first words said by defendant when he met Dick Doctor were: "Are you scared?" If the court had told the jury this, or if it had been read by the reporter, that would not have helped the defendant in any way. The defendant next asked Dick Doctor (according to defendant's testimony), "Did I hurt anybody?" If the court had told the jury this, or if it had been read by the reporter that, too, would not have helped the defendant, for that question implied that the defendant was conscious of his guilt of his having shot the deceased.

It may be noted the statutes relating to the court giving the jury information as to the testimony is permissive and not mandatory. In 23 C.J.S. § 1377, p. 1051, it is said:

"On the other hand, the court may in the exercise of a sound discretion decline to allow the recollection of the jury as to the evidence to be refreshed in any way, although the court may fall into prejudicial error where it abuses its discretion in refusing to make available to the jury a restatement or rereading of a vital portion of the testimony."

As already noted, we are unable to see how the defendant could have been prejudiced in the case at bar. So that we think in this case we should apply the rule, as stated for instance in Compton v. State, 179 Ga. 560, 176 S.E. 764, 768, as follows:

"In case of disputes on the part of the jury as to the evidence, it is not error for the judge to allow recollection of the jury to be refreshed in any of the ways above referred to; but he may decline to do so altogether, and his doing so would not be ground for reversing the judgment, except in a case where it was clear that injustice had been done. 'If he should decline to aid the jury in any way, but leave them to recall the evidence as best they could, this would not be ground for reversing the judgment.' Strickland v. State, 115 Ga. 222, 41 S.E. 713, 716."

So it is said in State v. Jennings, 131 Or. 455, 282 P. 560, 567:

"He (the trial judge) may likewise decline to state his recollections concerning a part of the testimony when the juror's question calls for the judge's finding upon the incident referred to. Commonwealth v. Allen, 256 Mass. 452, 152 N.E. 739."
See also State v. Close, 106 N.J.Law 321, 148 A. 764.

We accordingly find no reversible error in connection with the complaints above discussed.

18. Constitutional Rights — Commitment to State
    Hospital.

Section 10-903, Wyoming Compiled Statutes 1945, as
amended by chapter 87, Session Laws of Wyoming,
1951, provides that when a defendant pleads insanity,
he shall be committed to the Wyoming State Hospital
for a period of 30 days but not to exceed 60 days. In
this case the defendant was so committed on April 15,
1953, and sent back to Wheatland about August 9, 1953.

(a) The court making the order of commitment
provided that the result of the observation and ex-
amination in the hospital should be reported to the
court in writing. No time was specified. The statute
does not require such written report. No written report
was in fact made until about November 30, 1953. It
was made to the prosecuting attorney. We are not ad-
vised as to the contents thereof, whether it stated
merely the "result" as stated by the court, or some
details. The trial in this case commenced on December
11, 1953. Counsel for the defendant complain that they
did not receive a copy of the report in order to
examine it. It appears herein, by the affidavit of the
prosecuting attorney, that defendant's counsel did not
make a demand to see the report after it was received;
further that they found out the "result" of the ex-
amination from Dr. Whalen at least in the month of
October 1953. They did not ask for a continuance of the
case so that they might examine the report before the
trial. They cross-examined the physicians who testi-
fied for the state at length. We find no reversible error
in this connection. See Commonwealth v. Belenski, 276
Mass. 35, 176 N.E. 501; State v. Paine, 49 La.Ann.
1092, 22 So. 316.

(b) The defendant was detained in the hospital for
more than 60 days and reversible error is predicated on

that fact. We find no sound reason for limiting the time to 60 days, and hence that provision must be held to be purely directory. No effort was made to have defendant released, as, for instance, by a writ of habeus corpus. It is hardly probable that the defendant wanted to be released, and exchange the comparative comfort at the hospital for the discomfort in the jail at Wheatland.

(c) Counsel for defendant complain that the defendant was taken to Salt Lake City, Utah, to be examined by Dr. Powell, a neurologist, and have the electroencephalogram taken, at the same time complaining that the test was not taken more thoroughly while the defendant was asleep. Apparently no such instrument is in this state. Dr. Whalen testified that defendant was taken to Dr. Powell so as to give him, the defendant, all the benefit of doubt as to whether he was sane or insane. It turned out that this was not a benefit to the defendant, inasmuch as Dr. Powell testified that the defendant was sane. But it might have been for the defendant's benefit. It is claimed that it was unlawful to take defendant out of the state and into Utah, and that he became a free man when he entered the latter state. If so, it would probably have benefited the defendant very little, since he probably could have been brought back into this state. We do not think that this matter presents any reversible error. We might as well hold that when women convicted of a felony, and taken to an institution in Colorado, as they are, they then, immediately upon crossing the state line, become free. Counsel for the defendant state that we have no interstate compact with Utah. We do not think that has any bearing in the case. Much of Dr. Powell's testimony, and perhaps his most effective testimony, was in answer to a hypothetical question. At least no possible objection could

be made to that part of the testimony merely because he came from Utah. We do not find that the defendant made any objection whatever to being taken to see Dr. Powell at Salt Lake City. How the *place* of examination could make any difference to defendant is not easily perceived. It is difficult to see how the defendant would have had a fairer trial if Dr. Powell's examination had been made in Evanston, Wyoming, rather than Salt Lake City, Utah.

(d) It is contended that the communications to the physicians who testified for the state were privileged communications. There is no merit in that contention. These physicians were not the personal physicians of the defendant, but physicians employed to find out whether the defendant was sane or insane. People v. Kemmler, 119 N. Y. 580, 24 N.E. 9; People v. Austin, 199 N.Y. 446, 93 N.E. 57; Hopkins v. State, 212 Miss. 772, 55 So.2d 467; Rogers v. State, Miss., 76 So2d. 831; State v. Coleman, 96 W.Va. 544, 123 S.E. 580.

(e) Defendant objected to the testimony of Genevieve Taggert who administered the electroencephalogram test and to the testimony of the state's physicians who testified as to the sanity of the defendant. The objection in substance is that by being sent to the hospital at Evanston, Wyoming, the defendant was compelled to testify against himself; that the proceeding was not due process of law; that it is similar to unlawful search and seizure.

There are a good many decisions on this matter, and particularly since statutes have been enacted that a defendant pleading insanity should be committed to a hospital for observation and examination. A discussion of the subject is found in 16 C.J. § 1099, p. 568; 23 C.J.S. § 940, p. 244; 14 Am.Jur. § 47, p. 803. An annotation on the subject is contained in 32 A.L.R.

2d 437 to 483. On page 441 of the annotation the author says:

"The validity of statutes which establish a method of procuring an impartial expert examination of a defendant awaiting trial, where a question exists as to his sanity, has now been generally recognized.

"Although various constitutional questions have been raised against such statutes, the courts have almost without exception upheld them."

On page 444 of the annotation it is stated:

"One of the principal objections advanced against statutes providing for examination of the defendants by experts appointed by the court or designated by statute has been that such an examination results in the accused being obliged to give evidence against himself, as the result of his participating in the examination. In the following cases, attacks on the constitutionality of statutes based on the theory of self-incrimination have been rejected."

Cases are cited from Alabama, Arkansas, California, Colorado, Indiana, Louisiana, Massachusetts, South Carolina and Wisconsin. On page 450 of the foregoing annotation, it is stated:

"The cases in which the contention has been made that application of statutes of the kind under consideration constituted a denial of due process have been generally decided against such contention."

Cases are cited from Alabama, California, Louisiana, Massachusetts, South Carolina, Wisconsin, and also Federal cases.

Thus in State v. Eastwood, 73 Vt. 205, 50 A. 1077, 1079, the court stated:

"Under objection and exception the superintendant (of the hospital) testified, giving his opinion as to the respondent's sanity, based upon what he saw of him, and his actions and conversations during the time he was confined in the hospital. He testified that, in his

opinion, the respondent was sane. The objections made to this testimony was that it was in violation of the constitutional rights of the respondent as guaranteed by article 10 of the declaration of rights in the constitution, which provides that no person upon trial for a criminal offense shall be compelled to give testimony against himself. The commitment of the respondent to the asylum was not in derogation of that right. It was necessary to restrain him somewhere, and it was as lawful to confine him in the asylum at Waterbury as in the jail at Middlebury, and very likely it was more comfortable for him. He could be observed by any one at either place, and such persons could testify without conflicting with the respondent's constitutional rights; otherwise one under indictment could insist upon strict seclusion and being unseen. He was not obliged to do anything or say anything at the asylum, but, if he did, any observer, including the superintendent, might testify and give his opinion as to his sanity, based upon what he saw the respondent do and heard him say while he was in confinement in the asylum."

In People v. Strong, 114 Cal.App. 522, 300 P. 84, 87, the court stated:

"We fail to see any merit in the contention that under section 1027 (providing for the appointment of physicians) a defendant is compelled to be a witness against himself. Nothing in the section compels him to submit to an examination. If he does so the action is purely voluntary. To assert his constitutional rights all that is required is for him to stand mute, and possibly, also, to refuse to permit the examination, when the appointed expert undertakes to proceed; and whether he does so or not there is no compulsion."

In Commonwealth v. Di Stasio, 294 Mass. 273, 1 N.E. 2d 189, 195, the court said:

"There is nothing in the contention that by the examination the defendant was 'compelled to * * * furnish evidence against himself,' in violation of art. 12 of the Declaration of Rights. Commonwealth v. Millen, supra. The defendant was not required by law nor by

any mode of compulsion to talk with the examiner, nor to answer his questions. The notion that a person accused may not be subjected to the observation of witnesses and jurors is a perversion of the rule against self-incrimination."

See also State v. Coleman, 96 W.Va. 544, 123 S.E. 580; Wehenkel v. State, 116 Neb. 493, 218 N.W. 137.

The foregoing contentions of the defendant must accordingly be overruled. We have made the most careful examination of the record and of the briefs of counsel for the defendant and have been unable to find any reversible error, and the judgment of the trial court is affirmed.

And now this court appoints Wednesday, September 5, 1956, for the execution of the sentence pronounced in the court below.

Affirmed.

Harnsberger, J., and Parker, J., concur.

ON PETITION FOR REHEARING.

(No. 2666; July 31, 1956; 300 Pac. (2d) 567)

## OPINION

Blume, Chief Justice.

A petition for rehearing has been filed herein, and by doing so counsel for defendant have shown a praiseworthy effort to do all that is possible to be done for their client.

We have read the petition for rehearing and the brief that accompanies it with care. However, it covers the same ground which was covered in the original arguments, and we considered all the points involved with meticulous care in our original opinion, as may be noted by the length of it. It would subserve no good purpose to go over them again and attempt to find additional reasons for the conclusions reached. We might, however, mention just a few matters. Counsel say that to be guilty of premeditation, defendant must have had time to deliberate. The trial court so instructed the jury. True, the jealousy of the defendant and the excitement incident thereto probably continued up to the time of the homicide. The jury had the privilege, if it chose to exercise it, to find that that fact alone should reduce the penalty. This court, as a court

of law, has no such privilege, but is bound by the verdict of the jury, if, as a matter of fact, the defendant had time to deliberate, as the testimony shows he had. To lay down a rule that jealousy and the excitement incident thereto prevents, as a matter of law, the infliction of the penalty for first degree murder is — and we think with good reason — contrary to the decisions on the subject. 1 Warren on Homicide, Permanent Edition, p. 375, says: "Where a husband kills his wife because of jealousy, or because she is unfaithful, he is guilty or murder in the first degree." See to the same effect State v. Burns, 148 Mo. 167, 49 S.W. 1005, 71 Am.St.Rep. 588, and note appended. The same rule should, of course, apply to the case at bar. Dr. Whalen's testimony, when he related what defendant told him, discloses no confession of the defendant. In the main, he merely related what defendant testified on the witness stand, and in view of that fact the testimony above mentioned should have helped him with the jury instead of hurting his cause. As to the refusal or failure of the court to instruct the jury as to the rights of the pardon board, while it did not literally follow what we said in State v. Carroll, 52 Wyo. 29, 69 P.2d 542, the refusal or failure to instruct on that matter had the same effect.

The defendant is guilty of a serious crime. He killed not only one person, he killed two. That accentuates the fact that if defendant had a fair trial, as we think he had, no sentiment or sympathy on our part should permit him to escape the penalty which the law decrees. It is not he alone whom we must consider. We must consider society as well. A warning must be given that to take another's life is dangerous to the one who takes it. We have too many killings. If capital punishment is to be abolished, that must be done by the legislature. We have no power to do so. We but follow the law, and

must do so. It is not this court that is sending the defendant to his death. That was done by the jury, and unless we find a prejudicial error of law, as we have not found, we have no right, privilege or power to interfere with its province, centuries old as that province is.

The petition for rehearing is denied.
Harnsberger, J., and Parker, J., concur.